774 A.2d 757 (2001)
In re B.G.
Appeal of C.G., Mother. (at 925)
In re B.G.
Appeal of B.G., A Minor. (at 926)
In re B.G.
Appeal of M.G., Father. (at 927)
Superior Court of Pennsylvania.
Argued January 31, 2001.
Filed April 20, 2001.
*758 Michael S. Gingerich, Lewistown, for C.G.
David A. Goldman, Lewistown, for B.G.
David W. Barron, Lewistown, for M.G.
Stephen S. Snook, Lewistown, for Com., participating party.
Patricia A. Gardner, Lewistown, for Mifflin County Children & Youth Services, participating party.
Before POPOVICH, JOYCE and BROSKY, JJ.
BROSKY, J.:
¶ 1 This is a consolidated appeal from an order terminating parental visitations between M.G. and C.G., (the parents) and their daughter, B.G. Both parents and the minor child, B.G., have appealed from the decision. Generally speaking, all three appellants suggest that the court erred in completely terminating visitation. We agree and therefore reverse the order under appeal.
¶ 2 The facts underlying this appeal are quite sad indeed. B.G. is the minor daughter of C.G., (Mother) and M.G. (Father). At the time of the hearing precipitating this appeal, B.G. was two months shy of her fifteenth birthday. At the tender *759 age of fourteen and ten months, B.G. had already given birth to a son and had been involved in a sexual relationship with her mother's paramour and later husband.
¶ 3 In November 1997, Father learned that Mother was having an affair with a man named Jeff Decker. Father ordered Mother out of the house but she would not comply. In response, Father fired a twelve-gauge shotgun in Mother's direction. This incident was witnessed by B.G. and her siblings. Father then left the marital residence and Mr. Decker moved in with Mother and the children.
¶ 4 Sometime after Decker moved into the residence, B.G. developed an infatuation with him and, it has been alleged, the two became involved in a sexual relationship despite the fact that B.G. was less than twelve at the time. In February 1998, B.G. discovered she was pregnant. It was initially suspected that Mr. Decker was the father of the unborn child. However, Decker denied any sexual contact with the child and later, after the child's birth, DNA testing proved the child was fathered by a teenage juvenile.
¶ 5 While B.G. was still pregnant she was to be placed in foster care pursuant to an emergency order filed by Mifflin County Children and Youth Social Services (CYS), but while in transport she jumped out of a moving vehicle. B.G. was then placed in Ashler Manor until the end of May when she was released to her mother, who had indicated that B.G. was to be placed in a shepherding program for pregnant teens. However, B.G. never entered this program, and, after she ran away from home to be with Jeff Decker, she was placed in shelter care at Passageways pursuant to an emergency order.[1]
¶ 6 B.G. remained at Passageways until placed in foster care on July 22, 1998. Two days later, B.G. was placed with Charles and Doreen Pent, her foster parents. A final decree adjudicating B.G. dependent was entered on August 3, 1998. On September 24, 1998, B.G. gave birth to a son. Both B.G. and her son have continued to live with the Pents since July 24, 1998.
¶ 7 Despite the fact that Jeff Decker had been involved in a sexual relationship with B.G., Mother married Mr. Decker in February 1999. The marriage proved short-lived, however, as the two separated in April 1999, whereupon Mother and Father attempted a reconciliation of their marriage. However, the reconciliation proved unsuccessful and the two separated sometime later. At the time of the hearing, Mother lived with her parents and Father lived with a new paramour and the parties' youngest daughter, Crystal.
¶ 8 The visitation history since B.G.'s placement in foster care has been quite changeable. At first B.G. had unsupervised visitation with her parents. However, after it was discovered that Mother was taking B.G. and her son around Mr. Decker during visitation, unsupervised visitation was ceased and B.G. had supervised visitation with Father. Apparently, B.G. had very little contact with Mother while she remained involved with Jeff Decker. In May 1999, after Mother had separated from Decker, all visitations were suspended pending evaluation. However, B.G. did have phone contact with her parents during this period of time. Subsequently, supervised visits with both parents were reinstated in September 1999, although Father had difficulty making the supervised visits due to his *760 occupation as an over-the-road truck driver that kept him away from home most of the week.
¶ 9 In February 2000, after a routine review hearing, the court decided to reexamine the visitation situation and ordered the psychologist assigned to the case, David G. Ray, to complete an evaluation for those purposes. A hearing was held on March 23, 2000, during which Mr. Ray testified as did both parents and B.G. After the hearing was concluded, the court entered the order currently under review which terminated parental visitation. Both parents and the minor child filed appeals from that order, which brings us to the current juncture.
¶ 10 A key procedural distinction must be made in the present case, as the applicable standard of review is considerably different depending upon whether or not family reunification remains the formal goal of the family service plan. In this regard, the law was aptly summarized in the case of In Re C.J., 729 A.2d 89, 95 (Pa.Super.1999):
In dependency cases such as this, the standard against which visitation is measured also depends upon the goal mandated in the family service plan. Where, as here, reunification still remains the goal of the family service plan, visitation will not be denied or reduced unless it poses a grave threat. If, however, the goal is no longer reunification of the family, then visitation may be limited or denied if it is in the best interests of the child or children. The "best interests" standard, in this context, is less protective of parents' visitation rights than the "grave threat" standard.
(Emphasis added).
¶ 11 It should be understood that the difference just noted is real and not merely semantical. As C.J. points out, in considering the matter of visitation, more than just the child's best interests are at issue; there is also the constitutionally protected interest of a parent to visitation that must be considered. See Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Moreover, if the parents' right to visitation is injected into the equation, then, logically speaking, a result that is strictly in the child's best interests might have to yield somewhat to accommodate the parents' constitutionally protected right where the two are not the same.[2] In other words, where the two are seen as in conflict, both interests would have to be weighed and a result which equitably balances the two must be reached. If this were not the case there would be no need for a different standard, as the "best interests of the child" standard would apply regardless of the underlying circumstances and the interest of the parents would play no part in the decision at all.
¶ 12 In the present case, at the time in question, the formal goal of the family service plan was family reunification since CYS had not, at the time of the action in question, petitioned the court for a change in goal to either adoption or termination of parental rights.[3] As such, under the applicable legal standard, visitation should not have been terminated unless *761 the evidence supported the conclusion that continued visitation would pose a "grave threat" to the child.
¶ 13 While in the present case CYS presented a strong case for why continued placement was necessary, in reality, a considerably weaker case was made that the child would be exposed to a "grave threat" unless visitation was ceased. In fact, very little evidence was presented in this regard in CYS's direct case, although Mr. Ray provided more testimony in this regard when subjected to cross-examination by the lawyers of the three appellants. Indeed, the impression that is created from a review of the transcript is that CYS and the trial court were operating under a mistaken impression of the proper standard. The testimony seemingly reaffirms the need for continued placement and, possibly, suggests that the best interests of B.G. would be served by terminating parental visits altogether. However, there appears to be no cognizance of the "grave threat" standard at all.[4] Indeed, the trial court's opinion states in its conclusion, "the termination of visits between B.G. and her natural parents is in B.G.'s best interest."
¶ 14 A review of a couple of relevant passages from Mr. Ray's testimony illustrates the apparent misfocus permeating the hearing below. Mr. Ray states:
... the most important thing that we can do for [B.] is put her in an atmosphere in a milieux, if you will, try and make up for the lack and loss of time in the development of her personality. Think of a person developing like a triangle. A triangle is a very strong geometric design. When you raise [B.] in a home like she was raised in you're taking out key pieces of the base and making it very unstable. Starting with the development of appropriate empathy. The development of boundaries and limit setting. As I said, an hour of counseling isn't going to cut it. She needs to be somewhere where 24 hours a day she is surrounded by appropriate atmosphere and hopefully we can fill in some of the very significant gaps on this metaphorical triangle if you will.
N.T., 3/23/00, at 27-28.
¶ 15 The most notable observation about the above passage is, as pointed out above, that it represents compelling testimony of why B.G. needs to remain in foster care. Yet, in reality, it does not respond to the issue in question, namely whether continuing the very limited supervised visitation will pose a grave threat to B.G. We can accept that B.G. has suffered in the past and experienced psychological damage and stunting of emotional growth. However, the prescription offered by Mr. Ray to cure this situation has already been achieved. The question in the present case is whether the good the present placement is achieving is somehow being undone, or will be undone, by the rather limited supervised visitations that existed prior to the court's order. None of Mr. Ray's testimony addresses this point with anything approaching specificity.
¶ 16 Similarly, when asked, at the close of CYS's case, the "sixty-four thousand dollar question," as counsel termed it, referring to whether there should be any continuing visitation or contact between B.G. and her parents, Mr. Ray stated "with great regret, it is my very strong opinion that there should be no contact." *762 Id., at 20. However, when asked to explain his reasons for that opinion Mr. Ray stated:
The parents have done an abominable job. And I've certainly touched on that. One would think if the parents had any insight into what is [B.'s] best interests after all of the intensive steps that this county through Children and Youth and through your Honor's court that they have taken step after step and you would think the parents would turn themselves around one iota and do something right, if you will.
Id., at 20. Again, Mr. Ray seems singularly focused on the situation that has already been alleviated, i.e., the parents' poor parenting. It is entirely conceivable that B.G.'s prior situation does bear upon the advisability of continued visitation in some indirect fashion. However, CYS does not demonstrate the connection with any clarity at all and does not really address the pertinent question, whether continued visitation poses a "grave threat" to B.G., either in the passages quoted above or elsewhere in Mr. Ray's testimony.
¶ 17 While there appears to have been a misapprehension of the correct legal standard, we will not vacate the order in question out of hand but will, instead, conduct a review of the record to determine whether it appears that it is beyond question that CYS nonetheless met the "grave threat" standard.[5]
¶ 18 Turning now to an evaluation of the evidence of an adverse impact of the visitations upon B.G., since the parties were already operating under a visitation schedule when the current order was filed, the most logical place to look to determine whether continued visitation would pose a "grave threat" to B.G. would be the already existing visitation history. Viewed from this respect, there appears to be no evidence that B.G. experienced any significant ill effects, either physically or emotionally, from parental visitations prior to the entry of the order in question. Initially, it should be noted that there is no suggestion that either of B.G.'s parents poses a physical threat to her. While clearly B.G. was raised in a dysfunctional home setting, neither parent has ever been accused of physically abusing her. Rather, the threat to B.G., if any, appears to be in the realm of the emotional and psychological.
¶ 19 In support of his opinion that visitation should be terminated, Mr. Ray cited two specific instances of "poor judgment" on the part of Mother that took place during the prior visitations. However, notably, it appears that outside of these two instances, which we will address shortly, Mr. Ray seemingly agreed that the visitations went on without incident or difficulties and that there existed some form of positive relationship between Mother and B.G.[6]
¶ 20 The specific instances of poor judgment with which Mr. Ray expressed considerable concern were Mother's provision of cigarettes to B.G. during a supervised *763 visit and her mentioning of the possible whereabouts of her former paramour-husband, Jeff Decker. The poor judgment in providing B.G. with cigarettes would seem self-explanatory, but might possibly be explained by a desire to ingratiate herself to her daughter,[7] a sort of misguided way of offering a treat to B.G. and akin to how a parent might bring a cookie or candy to a younger child. As for the mentioning of the possible location of Mr. Decker, according to Mother, the statement was a brief response to a question from B.G. asking whether Mother had been able to find Decker to serve him with divorce pleadings. Mr. Ray opined that this disclosure evidenced extremely poor judgment on Mother's part.
¶ 21 While we would not disagree that Mother displayed poor judgment in divulging the information about Decker's whereabouts, it should be noted that the specific threat from divulging Mr. Decker's reported whereabouts was rather speculative. It was based upon the assumption that B.G. might be tempted by this knowledge to run away from foster care to Mr. Decker. While indeed, this may have been a legitimate concern, there is no indication that B.G. ever gave any thought to running away to Decker. Moreover, it is speculative that this particular piece of information might have provided impetus that was not already there. In other words, if B.G. were truly set on running away to see Decker, she may very well have done so regardless of whether or not Mother had divulged any information regarding Decker.
¶ 22 More importantly, while Mr. Ray's testimony tended to prove, through the above two instances, that Mother was still lacking in good parental judgment, it does not necessarily follow that the larger thesis was proven. Given the standard of the inquiry in question Mr. Ray's commentary would be relevant only if, within the confines of the supervised visitation, the continued poor parental judgment poses a "grave threat" to B.G. While the parents' poor judgment might pose a threat to B.G. if she were still in her parents' custody, it should be noted that, for the most part, B.G. was no longer in a position to be harmed by her parents' poor judgment. Since the visitations were brief, supervised and limited to every two weeks, and since control over B.G.'s everyday life is now in the hands of her foster parents, realistically speaking, there would seem to be little chance that the poor judgment the parents demonstrated over B.G.'s life could have any significant impact upon B.G.'s current life.
¶ 23 One respect in which Mr. Ray's discussion might be relevant is the suggestion that B.G.'s parents were "undercutting" the authority of the foster parents. This allusion relates to Mother's provision of cigarettes. Mr. Ray indicated that B.G.'s foster parents were attempting to teach B.G. right from wrong and Mother, by providing B.G. with cigarettes, took a step to undercut their efforts in a mere half-hour visitation. N.T., 3/23/2000, at 21. While Mr. Ray's concern is certainly legitimate, Mr. Ray points to a single instance to support a general assumption that many more instances of this kind are going on. We do not believe that we can accept this premise on mere assumption or the provision of one instance of such behavior. Additionally, a similar situation is often contended in the context of custody matters. Despite the fact that this situation seems to go on in custody matters, the courts do not respond by eliminating all custody or visitation rights of the offending parent.
*764 ¶ 24 More importantly, it appears that despite the foster parent's objections, B.G. was in fact smoking. This underscores an important point; a 14-year-old child is nearing adulthood and may be quite strong-willed despite the best efforts of the "parents" to "keep him/her in line." Typically a 14 or 15-year-old teenager will be exposed to many temptations and "bad influences" in their normal lives, be it at school or outside of school. There is no way, outside of taking drastic steps that themselves could prove psychologically harmful, to insulate a child completely from such influences. As a result of such influences, all children of that age are required to make judgments and "police" themselves to a significant degree.
¶ 25 As experience teaches, some children do this quite aptly while others fail to some degree. Even assuming that by allowing limited visitation B.G. will be exposed to some less than desirable "influences" and personality traits possessed by B.G.'s parents, it seems highly unlikely that the very limited exposure that will occur under the biweekly supervised visitations could begin to equal the undesirable influences of B.G.'s normal life experiences or could significantly counteract the sound parenting that, by all accounts, her foster parents are currently providing.
¶ 26 Additionally, as an analytical aside, the above two instances of poor parental judgment were both directed at Mother, and not at Father; thus they offer no support for the termination of Father's visitation rights.
¶ 27 The second basic thesis of Mr. Ray's testimony is that maintaining a bond with her natural parents might psychologically harm B.G. This thesis is more allusion than specifically made, that is, it is suggested by Mr. Ray's testimony, but is not truly specifically asserted. Moreover, Mr. Ray did not truly comment upon this possibility until cross-examined.[8] Nevertheless, since it was presented during cross-examination, we will consider it.
¶ 28 Mr. Ray commented upon certain observed short-term behavioral changes that occurred surrounding the visits. He noted that B.G. sometimes became agitated, upset or "acted out" either before or after the scheduled visits. Id., at p. 35. However, Mr. Ray never discussed how long these changes lasted or what the changes signified with respect to B.G.'s emotional state of mind and well-being. Again referring to circumstances that surround typical custodial exchanges, such behavior is sometimes seen in advance of, or after, custody exchanges, particularly where the child may prefer one household or living circumstance over the other. Nevertheless, we do not necessarily abrogate a parent's custodial rights merely because the child evidences some emotional upset over spending time with one of the parents.
¶ 29 Perhaps even more cryptically referenced is the possibility that B.G.'s overall mental, emotional or psychological well-being or progress was being hindered by the visitations. Mr. Ray seemed to suggest this point but, again, never truly developed the point to any specificity. For instance, after discussing the value of a parent-child bond Mr. Ray stated "but what I see in this case is that the negative effects on her personality development by having the bond do far more damage than any of the positive effects that she could have from remaining bonded to her parents." N.T. 29. Yet, despite the above *765 commentary, Mr. Ray did not expound upon this statement to any significant degree. He did not explain the negative effects that B.G. is experiencing from continuing to see her parents on a very limited basis and how those negative effects might relate to her long-term emotional/psychological development or how much "threat" is posed by the limited exposure to her parents. Instead, Mr. Ray began discussing the above referenced temporary emotional disruption surrounding the visits as evidence that she is troubled, to some degree, by seeing her parents.
¶ 30 In contrast to the above, B.G. took the stand and testified that she loved her parents, would like to continue seeing them and that she would be "extremely upset" if she did not have an opportunity to see them. She also admitted to sometimes getting agitated or upset over the visits, "maybe just a little bit," but indicated that it only lasted a "couple of days." B.G. further explained her statement to Mr. Ray regarding not wanting to see her parents anymore indicating that she meant for a while, but did not wish to see visitation terminated permanently. Mr. Ray, despite generally providing testimony adverse to continued visitation, also indicated that children gain something from being bonded to their natural parents, even when the relationship is dysfunctional. Id., at 29.
¶ 31 To appreciate the proper focus of our inquiry in this case, we must put the case into proper context. There is no question that B.G. has had some extremely dysfunctional and harmful experiences in her life and that her parents are greatly responsible for this occurrence. Unfortunately, what is past is past and cannot be undone. It is also beyond question that B.G. is better served by living with her foster parents than with her natural parents. However, at this juncture, this conclusion is not being contested. Moreover, the point of our inquiry today is not to cast a finger of blame or responsibility for the past occurrences, nor is it to punish her natural parents for their past failures as parents. The inquiry before us is whether, given the circumstances presented, the maintenance of a nominal relationship between B.G. and her natural parents facilitated by limited supervised visitation will pose a grave threat to B.G.'s well-being. While it is certainly conceivable that the answer to this question is "yes," it seems beyond reasonable contention that CYS has failed to demonstrate that the continued visitation will pose a grave threat to B.G.
¶ 32 Consequently, given the above, we are obligated to reverse the order on appeal.
¶ 33 Order reversed. Jurisdiction relinquished.
NOTES
[1] The record does not disclose what type of facilities Ashler Manor and Passageways are, although it is apparent that both are designed for either the voluntary or involuntary housing of juveniles.
[2] Of course, ideally, continued parental visitation would be in the child's best interests.
[3] It could be argued that the "informal goal" was not family reunification. Given the circumstances of the present case and the actions of CYS, there seems to be little evidence that returning B.G. to her parents, or to one of them, was ever given serious consideration. In fact, CYS did subsequently file a petition, on August 3, 2000, which sought a change of goal from reunification to "another living arrangement intended to be permanent in nature...." Petition of 8/03/00.
[4] This misapprehension is further evidenced by a question asked by Mr. Torquato, attorney for CYS. In questioning B.G., Mr. Torquato characterized the thesis of Mr. Ray's testimony thusly: "Remember he told you that he was going to tell the Judge that, that he didn't think it was in your best interests for you to continue to see your mother and father;..." N.T., 3/23/00, at 74-75.
[5] Since we are empowered to affirm the order under appeal on other grounds if correct, we will conduct a review under the grave threat standard. However, so as not to usurp the role of the lower court as factfinder, we will affirm only if the evidence is such that no two reasonable people could disagree that the grave threat standard has been met. If our review reveals that this standard has been met, a remand would be pointless.
[6] We say "seemingly" because, in responding to this question put to him by C.G.'s attorney, Mr. Ray appeared ready to agree with the question, with exception to the two incidents in question, but then, prior to finishing the thought, went off on a tangent without ever directly answering the question.
[7] For the record, C.G. denied providing B.G. with cigarettes during any visits. However, B.G. indicated that her mother, in fact, provided her with cigarettes once.
[8] The only allusion to this premise was in the response to the last question asked on direct. Mr. Ray commented on the very dysfunctional environment B.G. grew up in and stated "she does not need to be exposed to that continuous dysfunction." N.T., at 22.