J-S23016-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: A.U., A MINOR : | IN THE SUPERIOR COURT OF |
| : | PENNSYLVANIA |
| : | |
| APPEAL OF: T.C., MOTHER : | |
| : | |
| : | |
| : | |
| : | |
| : | |
| : | |
| : | No. 3237 EDA 2016 |

Appeal from the Order Entered September 27, 2016
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): CP-51-DP-0001453-2016,
FID: 51-FN-001560-2016

| | |
|---|---|
| IN THE INTEREST OF: H.U., A MINOR : | IN THE SUPERIOR COURT OF |
| : | PENNSYLVANIA |
| : | |
| APPEAL OF: T.C., MOTHER : | |
| : | |
| : | |
| : | |
| : | |
| : | |
| : | |
| : | No. 3390 EDA 2016 |

Appeal from the Order Entered September 27, 2016
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): CP-51-DP-0001451-2016,
FID: 51-FN-001560-2016

| | |
|---|---|
| IN THE INTEREST OF: S.U., A MINOR : | IN THE SUPERIOR COURT OF |
| : | PENNSYLVANIA |
| : | |
| APPEAL OF: T.C., MOTHER : | |
| : | |
| : | |
| : | |
| : | |
| : | |
| : | No. 3391 EDA 2016 |

Appeal from the Order Entered September 27, 2016
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): CP-51-DP-0001452-2016,

FID: 51-FN-001560-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: J.U., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: T.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3392 EDA 2016 |

Appeal from the Order Entered September 27, 2016
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s):  CP-51-DP-0001450-2016,
FID: 51-FN-001560-2016

BEFORE:  OLSON, J., SOLANO, J., and MUSMANNO, J.

MEMORANDUM BY SOLANO, J.:                    **FILED MAY 08, 2017**

Appellant T.C. ("Mother") appeals from orders entered September 27, 2016, which continued the suspension of visits with her children, J.U. (born 2001), H.U. (born 2003), S.U. (born 2008), and A.U. (born 2013) (collectively "Children"), pending a future hearing.[1] We affirm.

We adopt the facts as set forth by the trial court:

On June 6, 2016, the Department of Human Services ("DHS") received a Child Protective Services ("CPS") report alleging that J.U. was raped by her stepfather, D.G. On June 7, 2016, D.G. was arrested and charged with rape by forcible compulsion, *inter alia*. D.G. is currently incarcerated at Curran-Fromhold Correctional Facility ("CFCF"). Thereafter, Mother began working with the Philadelphia Housing Authority ("PHA")

---

[1] "All orders dealing with custody or visitation, with the exception of enforcement or contempt proceedings, are final when entered." *In re H.S.W.C.-B.*, 836 A.2d 908, 911 (Pa. 2003) (citation omitted).

to obtain a different apartment and Mother obtained a Protection from Abuse ("PFA") order against D.G. On June 27, 2016, DHS visited the Mother's home, where the Children were determined to be safe. (Statement of Facts: Petition to Determine Dependency RE J.U.)

On July 13, 2016, DHS received a General Protective Services ("GPS") report which alleged that Mother was not cooperating with the criminal investigation against D.G.; Mother would not allow J.U. to testify against D.G.; Mother planned to reside with D.G. if he was released from incarceration; and that a bench warrant was issued against Mother for contempt of court in connection with her lack of cooperation in D.G.'s criminal matter. When Mother was arrested on July 13, 2016 pursuant to the bench warrant, police officers discovered correspondence between Mother and D.G.; that J.U. was anxious to testify against D.G.; and that Mother forced J.U. to speak with D.G. on the phone[1]; and Mother brought the Children to visit D.G. in prison. On July 13, 2016, DHS obtained an OPC [(Order of Protective Custody)] for the Children and the Children were placed in a foster home through Jewish Family and Children Services ("JFCS"). (Statement of Facts: Petition to Determine Dependency RE J.U.). On July 25, 2016, a dependency hearing was heard before the Honorable Judge Vincent Furlong and the Children were adjudicated dependent and the Mother was ordered not to speak with the Children about the ongoing criminal investigation regarding D.G. and future visits between Mother and Children were to be therapeutic and supervised. (Statement of Facts: Petition to Determine Dependency RE J.U.)

On September 27, 2016, the Court held a permanency review hearing to determine if T.C. ("Mother") should be allowed to resume supervised visitation with the Children. Prior to said hearing, CUA [(Community Umbrella Agency)], Mother and the Child Advocate had entered into an agreement to suspend visitation between Mother and the Children because [of] Mother's violation of a Court Order which stipulated that her visits with the Children be supervised. Mother was present and represented by counsel during said hearing. After a full hearing on the merits, the Court found clear and convincing evidence that visitation between the Mother and Children was to remain suspended because sufficient evidence had been presented as to Mother's moral deficiency. The Court found Mother posed a grave threat to the Children during and after the prior visitations

and Mother had violated prior court orders to not visit the Children without supervision. The Court found Mother continued to send text messages to J.U. and continued to interfere with the criminal investigation of D.G. despite Court Orders not to cause such interference. The Court also found that Mother had met the Children in secret without supervision and that Mother had encouraged the Children to lie to their Foster Parent and Therapists.

_____
[1] Mother is mute.

Trial Ct. Op., 12/9/16, at 2-4.

The orders entered on September 27, 2016, as a result of the hearing, stated that Mother's visits are to remain suspended "until further order of the court"; the Children shall remain in foster care and in the legal custody of DHS; the Children may be placed outside of the county; Mother is to continue mental health treatment and parenting classes; and Mother is ordered to stay away from Children and their schools. The orders also stated that the permanency goals for the Children are to return to their parent or guardian, and that the next permanency hearing was to be held on December 19, 2016.

On her appeal from those orders, Mother raises the following issues:

1. Did the court err when suspending Mother's visitations, a legislatively protected interest, when there was no competent evidence presented as to Mother's mental or moral deficiency?

2. Did the court err when suspending Mother's visitations, a legislatively protected interest, when there was no competent evidence presented as to Mother's posing great threats to the children during and after the visitations?

3. Did the court err when suspending Mother's visitations, a legislatively protected interest, when there was no competent

- 4 -

evidence presented as to DHS['] inability to provide Mother with a practicable solution for visitations?

Mother's Brief at 2.

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re L.V.*, 127 A.3d 831, 834 (Pa. Super. 2015) (quoted citation omitted). "In dependency proceedings our scope of review is broad. . . . [W]e must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate." *In re C.B.*, 861 A.2d 287, 294 (Pa. Super. 2004) (quoted citation omitted), *appeal denied*, 871 A.2d 187 (Pa. 2005).

We summarize Mother's arguments in support of her issues. First, Mother argues that the trial court's conclusion that Mother has a mental or moral deficiency which poses a grave threat to the Children is speculative, because it is based on Mother's past actions. Mother's Brief at 7-8. Mother claims she "can cease her actions based on the results of the ongoing investigations. She can also cease her actions with the help of counseling and therapy such as mandated in a dependency proceeding." *Id.* at 8. Mother asserts that her communications with the younger children are harmless, because they are not involved in the pending criminal case. *Id.* Similarly, Mother contends that, "since there was no evidence of any clear

and present danger of physical harms to the Children during the visitations, the burden is on DHS to prove that the Mother's visitations left the Children with serious emotional or psychological harms after the visitations." *Id.* at 9-10.

Next, Mother argues that in *In Re B.G.*, 774 A.2d 757 (Pa. Super. 2001), this Court held that children around the age of J.U. are required to "police themselves" to some extent, despite poor lapses of judgment made by their parents, and that suspension of visits can cause more psychological harms to a child than placing some responsibility to self-regulate on the child. Mother's Brief at 10-12 (citing *B.G.*, 774 A.2d at 764). Mother suggests that the fact that the Children became uncooperative with their caseworker is only a typical manifestation of separation from their parents, and that "courts do not abrogate the parental visitation rights on account of these changes." *Id.* at 13 (citing *B.G.*, 774 A.2d at 764).

Finally, Mother argues that the court erred in suspending visitation because DHS did not prove that there is no practicable means of allowing visitations without violation of its orders. Mother's Brief at 14-16 (citing *In re Rhine*, 456 A.2d 608, 612 (Pa. Super. 1983)). According to Mother, the court should have found Mother in contempt of court for violating its order, rather than suspending visitations. *Id.* at 14-15. Mother argues that because she is mute, DHS should be able to devise a way to have visitations occur while still protecting the children. *Id.* at 16.

Regarding our review of visitation restrictions, we have stated —

Where, as here, reunification still remains the goal of the family service plan, visitation will not be denied or reduced unless it poses a grave threat. . . .

The "grave threat" standard is met when the evidence clearly shows that a parent is unfit to associate with his or her children; the parent can then be denied the right to see them. This standard is satisfied when the parent demonstrates a severe mental or moral deficiency that constitutes a grave threat to the child.

*L.V.*, 127 A.3d at 839 (citations omitted). "[P]arents whose visitation is opposed by the state constitute a grave threat to their child only where there are no practicable visitation options that permit visitation and protect the child." *Rhine*, 456 A.2d at 614. "Unless the state demonstrates with clear and convincing evidence that even supervised visitation would severely endanger the child, the court must deny the complete foreclosure of parental visitation as being contrary to the Act's goal of family preservation." *Id.*; *accord In re Mary Kathryn T.*, 629 A.2d 988, 995 (Pa. Super. 1993), *appeal denied*, 639 A.2d 32 (Pa. 1994).

The "grave threat" standard is met not only where a parent poses a physical threat to their child, but when the child is in danger of emotional abuse. *See, e.g.*, *C.B.*, 861 A.2d at 294 (where a father's visits to his son were suspended based on the father's heinous sexual abuse of the son's half-sister in his son's presence, affirming that such "clearly established moral depravity" poses a grave threat, justifying suspension of visitation rights). Moral deficiency constituting a grave threat can also be based on a

parent's failure to protect a child from previous abuse by the other parent, or a parent's continued association with an abusive parent. **L.V.**, 127 A.3d at 840. In **L.V.**, for example, we affirmed the termination of visits with an infant's mother where it was shown that the infant suffered physical abuse at the hands of his father, the mother either knew or should have known of that abuse, and the mother continued to associate with the father even after the abuse had been discovered and the father imprisoned. **Id.** at 833-36, 840.

However, prior poor judgment by a parent, when not indicative of a child's danger of future harm, does not constitute a grave threat. **See B.G.**, 774 A.2d at 762-63 (Mother did not pose a grave threat where she exercised poor judgment during two visits by supplying her 14-year-old daughter with cigarettes and by telling her the location of her prior abuser, where there was no evidence of physical or emotional ill effects resulting from the visits); **Mary Kathryn T.**, 629 A.2d at 991-96, (trial court's conclusion that parents posed a grave threat was not supported by the evidence, where testimony established that both parents had engaged in therapy to improve their parenting skills).

"In rare instances, we have approved restricting or **temporarily** suspending visitation even though there has been no showing of such severe mental or moral deficiencies in the parent as would constitute a grave threat to the child's welfare." **In re Damon B.**, 460 A.2d 1196, 1198 (Pa. Super.

1983) (emphasis in original). In ***Damon B.***, we affirmed a reduction in visitation, not based on the mother's moral deficiency, but because of the psychological ill-effects the visits caused to her son. ***Id.*** We stressed, however, that "[o]ur decision in this case is influenced by the fact that this is a temporary reduction in visits rather than a long-term cessation of visits. In the latter case, of course, the trial court **must** find, by clear and convincing evidence, that visitation poses a grave threat to the child." ***Damon B.***, 460 A.2d at 1198 n.1 (emphasis in original). In ***Damon B.***, the trial court was scheduled to review the determination within the next seven months. ***Id.*** at 1198.

In the case at hand, the trial court concluded that "the testimony of the DHS worker and the documentation presented to the Court provided clear and convincing evidence that Mother's continued visitation with the Children constituted a grave threat" and that "continued visitation by the Mother caused significant emotional effects to the Children." Trial Ct. Op. at 5-7 (unpaginated). The trial court based its conclusion on both the actions by Mother and their effects on the Children. The court found that Mother violated the court's order not to communicate with the Children regarding the criminal investigation of D.G. and the court's order that all communications and visitations be supervised; Mother did this by meeting with the Children without the knowledge of DHS, providing a cell phone, and secretly texting the Children. ***Id.*** at 5-6. Moreover, in her text messages,

Mother encouraged the Children to lie to their foster parent and therapists in order to interfere with both the placement of the Children and the prosecution of D.G. *Id.* The court also found that these secret and unsupervised interactions had emotional effects on the Children: they caused J.U. to have suicidal ideations and to be placed in a mental healthcare facility, and led all of the Children to become secretive and defensive in their interactions with DHS. *Id.* The trial court based most of its factual findings on the testimony of the DHS case manager, which, the court stated, "was deemed credible and accorded great weight." *Id.* at 6.[2]

We find that the trial court's conclusions are well-supported by the record. Before the Children were put into placement, Mother continued to associate with D.G.; prevented J.U. from testifying against D.G. at the preliminary hearing on his rape charges; and made J.U. speak to D.G., her alleged rapist, on the telephone. After the Children were put in placement and Mother was ordered to have supervised visits only, Mother did not just violate the court's order by seeing the Children and communicating via secret text messages, but Mother actually told the Children to lie in court,[3]

---

[2] The case manager who testified at the hearing works for the CUA placement center used by DHS. N.T., 9/27/16, at 4.

[3] Mother asked her Children to act "dramatic, crying, and begging" in their interactions with the District Attorney. N.T. at 14.

to DHS,[4] to their foster parent,[5] and to their therapists.[6] Evidence of these conversations was introduced through screen shots of the text messages from Mother found on one of the Children's cell phones. Additionally, Mother provided expired sleeping pills to her daughter, unbeknownst to her caretakers. *Id.* at 21. The immediate results of Mother's words and actions were that her oldest daughter, J.U., was placed in a mental healthcare

---

[4] Mother asked the Children to lie if anyone asked whether a former foster mother assisted in one of Mother's unsupervised visits. N.T. at 16.

[5] Mother asked J.U. to lie about whether Mother had visited her at school. N.T. at 21-23.

[6] Mother's text messages to J.U. instructed:

> [W]hen you start therapy, dominate every session. All you want to talk about is seeing your mom and going home with your brothers. Make them listen. Let them know I did not make you talk to [D.G.] so we could communicate. It's a habit for you to answer my phone when it rings. And that's what you did.
>
> I would hang up, but [D.G.] would call back. And you felt like that's your dad calling to answer. Play these people how they try to play you. . . .
>
> You are far too intelligent to let these people get you got. You can dominate this entire situation. You are your mother's child.
>
> \* \* \*
>
> You're a little me. So, I know you're capable. If you can manipulate them instead of them doing it to you, and we can be back together before Christmas if we work on this together.

N.T. at 27-28.

facility due to suicidal ideations, *Id.* at 7, 10,[7] and the other Children became secretive and uncooperative with their caseworker. *Id.* at 29-30.

We therefore find, contrary to Mother's assertions in her first two issues, that clear and convincing evidence was presented that Mother has moral deficiencies and that these deficiencies pose a grave threat to her Children. Like the mother in *L.V.*, 127 A.3d at 833-36, 840, Mother does not pose a direct physical threat to her Children, but continually exercises judgment that puts the Children in harm's way through such things as continued interactions with D.G., encouraging the Children to deceive their caretakers regarding their whereabouts, and providing secret (and expired) medication. Mother's actions are not the minor lapses in judgment exhibited by the Mother in *B.G.*, 774 A.2d at 762-63, but exhibit a persistent intent to interfere with the Children's ability to engage in honest communication with their therapists and caretakers.

We are troubled by the great lengths to which Mother has gone in an attempt to influence her daughter's testimony, despite being ordered not to do so. The record substantiates that such interference from a parent is bound to place undue stress on a child, and we agree with the trial court that under these circumstances, suspension of visitation is the most appropriate response. And, while most of Mother's actions have thus far

---

[7] J.U.'s mental state was attributed to stress regarding Mother getting into trouble for communicating with her. N.T. at 10.

been directed at her two older children,[8] and have caused the most tangible harm to her eldest child, the trial court understandably was concerned by the impact that Mother's moral deficiencies would have during visitation with her younger children as well.

Moreover, like **Damon B.**, 460 A.2d at 1198 n.1, this case involves only a temporary restriction on visitation. The child advocate requested that visits be suspended until Mother completed parenting classes and therapy. N.T. at 34, 40. The trial court ordered an early relisting of the case, inviting Mother to present evidence that she completed parenting classes and no longer posed a danger to her Children. N.T. at 41. The court scheduled the next hearing to take place before three months had passed. **Id.** The trial court did not abuse its discretion in ordering such a temporary cessation of visits in its attempt to protect the Children from their Mother. **Cf. Damon B.**, 460 A.2d at 1198 (holding no abuse of discretion where the court was scheduled to review the determination within the next seven months).

Mother's arguments fail to recognize that almost all predictions of future behavior are based on past behavior, and that the trial court properly took into consideration Mother's ability to change by short-listing a hearing to review its determination. Further, with respect to Mother's contention that

---

[8] The record reflects that Mother sent text messages to J.U. and H.U., and that the text messages between Mother and H.U. had been deleted before the Children's caseworker could see them. N.T. at 8-9, 29.

her communications with H.U. were harmless, we acknowledge that nothing in the record has established whether H.U. will be asked to testify at D.G.'s trial. But, as have stated, suspension of visitation is not appropriate merely to protect the criminal case against D.G. from tampering, but to protect the Children from the stress and moral dilemma they may face as a result from their Mother's attempts to interfere with that criminal case. Mother's insistence that there was no evidence of serious psychological harms misses the point: the trial court properly evaluated whether Mother poses a grave **threat** of such harm. The same evidence that demonstrates the harm already done to Mother's eldest daughter evinces the grave **threat** of harm Mother also poses to her younger children, whom she continues to manipulate. Mother's suggestion that J.U. was required to "police" herself to prevent Mother's poor lapses of judgment does not excuse the trial court's finding that Mother's unsupervised and unauthorized actions have caused J.U. such significant psychological harm as to warrant medical intervention, and pose a grave threat to the Children's emotional stability.

Under the facts of this case, the trial court's temporary suspension of Mother's visitation rights was appropriate. Mother's visitation was not suspended merely because she disobeyed the court, but because the unsupervised visits and communications that she had with the Children exhibited a wonton moral deficiency that had already begun to cause harm

to her Children. The record does not establish any practicable viable alternatives other than a temporary suspension.

Having discerned no abuse of discretion, we affirm the order below. *See L.V.*, 127 A.3d at 834.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/8/2017