J-S05016-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.J.H., MOTHER | : | No. 955 WDA 2023 |

Appeal from the Order Entered August 2, 2023
In the Court of Common Pleas of Erie County
Juvenile Division at No(s):  CP-25-DP-0000100-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: D.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.J.H., MOTHER | : | No. 956 WDA 2023 |

Appeal from the Order Entered August 2, 2023
In the Court of Common Pleas of Erie County
Juvenile Division at No(s):  CP-25-DP-0000099-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: S.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.J.H., MOTHER | : | No. 957 WDA 2023 |

Appeal from the Order Entered August 2, 2023
In the Court of Common Pleas of Erie County
Juvenile Division at No(s):  CP-25-DP-0000098-2023

IN THE INTEREST OF: T.R., A MINOR   :    IN THE SUPERIOR COURT OF
                        :        PENNSYLVANIA
                        :
                        :
                        :
                        :
                        :
                        :
                        :
APPEAL OF: R.J.H., MOTHER       :      No. 958 WDA 2023

Appeal from the Order Entered August 2, 2023
In the Court of Common Pleas of Erie County
Juvenile Division at No(s): CP-25-DP-0000097-2023

BEFORE: PANELLA, P.J.E., KING, J., and BENDER, P.J.E.

MEMORANDUM BY KING, J.:              **FILED: APRIL 4, 2024**

Appellant, R.J.H ("Mother"), appeals from the orders entered in the Erie County Court of Common Pleas, which established a permanency goal of adoption for A.R., D.R., S.R., and T.R. ("Children") and determined that the Erie County Office of Children and Youth ("OCY") need not make reasonable efforts towards reunification. We affirm.

The trial court opinion set forth the relevant facts and procedural history of this case as follows:

> On June 6, 2023, the Pennsylvania State Police ("PSP") were called to the area of Mother's residence after A.R. (age 4) and D.R. (age 2) were found in a neighbor's yard unsupervised. PSP made a referral to [OCY] after Mother could not provide them with basic information about the Children, including dates of birth.
>
> On June 7, 2023, [OCY] workers went to Mother's home to assess the safety of the Children. Upon arrival at the residence, [OCY] workers observed "multiple trash bags outside on the porch, flies and several small dogs inside a small wire fence." The outside of the home had a "very

- 2 -

strong odor of garbage and feces." Maternal Grandfather ("Grandfather") answered the door and stated Mother did not wish to speak to [OCY] but agreed to locate the Children so that the workers could assess their safety. While at the residence's front door, the workers observed deplorable home conditions, including feces on the floor and counters covered in boxes and trash. The workers attempted to engage Mother in conversation and described her as unable to have a coherent conversation. Specifically, Mother could not provide the Children's dates of birth and "kept making comments that people want her to be abused." Based on the home conditions and the caseworker's observations of Mother, [OCY] obtained an Emergency Protective Order ("EPO") for the Children.

On June 13, 2023, [OCY] filed Dependency Petitions ("Petitions") for the Children. The Petitions included a Motion for Finding of Aggravated Circumstances alleging aggravated physical neglect pursuant to [42 Pa.C.S.A. § 6302]. The Petitions alleged the Children were the victims of aggravated physical neglect by Mother and Father[1] in that they had a "profound, prolonged failure to provide supervisory, medical, and/or educational care to the [Children]," which has "seriously impaired the [Children's] functioning."

The Adjudication Hearing was held before the Juvenile Court on June 22, 2023.

(Trial Court Opinion, 10/19/23, at 1-2) (record citations omitted).

At the adjudication hearing, OCY presented expert testimony from forensic nurse practitioner Karin Wickwire. The parties stipulated to Ms. Wickwire's qualifications as an expert in the field of "child maltreatment." (N.T. Adjudication Hearing, 6/22/23, at 8). Ms. Wickwire examined Children and observed bruises, abrasions, and scars on their bodies. Children also

_____

[1] J.R. ("Father") is not a party to the instant appeal.

- 3 -

suffered from serious tooth decay. Ms. Wickwire described the two oldest children as unresponsive, which caused concern for the development of their speech and hearing. Ms. Wickwire also stated that the two youngest children were at risk of continued developmental delay, illness, and injury if they remained in Mother's home. Based on her examinations, Ms. Wickwire opined that Children were the victims of serious physical, medical, and educational neglect at the hands of their caregivers.[2]

Rhiannon Bernadini, a supervisor with OCY, testified regarding her visit to Children's home. In her experience as both an OCY supervisor and caseworker, Ms. Bernadini opined that Mother's home was "[p]robably one of the worst homes I've ever seen." (*Id.* at 39). Ms. Bernadini observed trash bags on the front porch, feces in the entryway, food scattered on the floor, and clutter throughout the residence. The home contained three mattresses, which were utilized by Mother, Father, and Grandfather. The adults in the home were unaware of where Children might have slept. Six dogs were "kept in cages in the basement [in] deplorable conditions." (*Id.* at 43).

During her visit, Ms. Bernadini encountered Mother. Mother made strange comments and seemed incoherent. After searching OCY's records, Ms. Bernadini discovered that Mother had a prior diagnosis of "hallucinogen-

---

[2] Complicating matters, Ms. Wickwire testified that there were no birth records for three of the children, because Mother had opted to give birth in her home. (*See* N.T. Adjudication Hearing at 31).

related disorders." (*Id.* at 49). Despite this diagnosis, Mother informed Ms. Bernadini that she was not receiving mental health treatment. Regarding her parenting of Children, Mother told Ms. Bernadini, "I neglected my children because [Father] neglected me." (*Id.* at 50).

At the conclusion of the hearing, the court found that OCY "had sufficiently established aggravated circumstances [and] Children had been the victims of aggravated physical neglect by the parents." (Trial Court Opinion at 11). On June 27, 2023, the court adjudicated Children dependent and established a permanency goal of reunification.

The court conducted a dispositional hearing on July 31, 2023. At that time, Ms. Bernadini testified that OCY indicated Mother "for medical neglect, dental neglect, and egregious lack of supervision." (N.T. Hearing, 7/31/23, at 7). Ms. Bernadini stressed that Mother "has essentially taken no accountability for the way that her children were. She seems to … blame [Father] for a lot of this." (*Id.* at 25-26). Under such circumstances, Ms. Bernadini doubted that OCY could offer a family service plan to remedy the situation. Ms. Bernadini also stated that Children were doing well in their foster homes. Children communicated more, ate with utensils, and slept in their beds. The foster parents were also addressing Children's dental and educational needs.

Following the testimony from Ms. Bernadini, Mother called the OCY caseworker, Erynne Kubat. Ms. Kubat testified that she worked with the family

to obtain birth certificates for the three children who lacked official documentation. Ms. Kubat explained that the relevant Commonwealth agency had contacted Mother to start the process. Ms. Kubat asked Mother "if anything had gotten followed up on as far as sending in the paperwork and necessary documentation." (*Id.* at 33). Mother claimed, however, that she was "not involved in the process at all," and Father "was doing all of it[.]" (*Id.*) Regarding Father's inability to complete the paperwork, there was "always something [that] came up" to derail his progress.[3] (*Id.*)

Ms. Kubat also testified regarding OCY's attempts to refer the family for services:

> [MOTHER'S COUNSEL]: Now from my understanding, at this point in time you don't have a court order open, but you can still make referrals for services such as mental health and other services, right?
>
> [WITNESS]: Yes.
>
> [MOTHER'S COUNSEL]: What about parenting classes? Did [OCY] make any referrals for parenting classes?
>
> [WITNESS]: No.
>
> [MOTHER'S COUNSEL]: Is there a reason?
>
> [WITNESS]: We did attempt to make a referral for family preservation. And while that is not a parenting class, it is an in-home service. They would be

---

[3] Ms. Kubat later admitted that the inability to obtain birth certificates/Social Security numbers impacted the children's ability to obtain dental care: "They did not have insurance. The family was concerned about paying for the children to see a dentist." (*Id.* at 37).

able to observe interactions with the parents and children and work with the family. That service plan was declined.

[MOTHER'S COUNSEL]:     By the family?

[WITNESS]:                        Yes; by the family.

[MOTHER'S COUNSEL]:     How about Project First Step?

[WITNESS]:                        That referral was not made.

[MOTHER'S COUNSEL]:     Okay. Or Homemakers?

[WITNESS]:                        No.

[MOTHER'S COUNSEL]:     Now early intervention—did you need to have the birth certificate and Social Security number to make the referral for early intervention?

[WITNESS]:                        Yes.

(*Id.* at 34-35).

At the conclusion of the hearing, the court made the following, on-the-record statement:

> [Mother] had four children; three of whom essentially did not exist [according to] the Commonwealth of Pennsylvania. She knew there were steps that needed to be taken. And I'm going to be very clear: I fault [OCY], as well, for the first year of this.
>
> But she was given some semblance of assistance, and at least made aware of what needed to be done. … And the children suffered as a result with rotten teeth, injuries, and basically an inability to function.
>
> \*     \*     \*
>
> And can mom get a job? And can she work on her own, and do all of those things? I'm sure she can. But I can't go back and find a program that's going to teach a mother who clearly … was not even able to brush her children's teeth.

The most basic thing that we do for our kids.

And for those reasons, I just cannot offer a treatment plan here. I do not find that there—there's just—you can't fix this. This is something that you can't fix at this point. When you can't meet a child's basic needs, we can't give you services to get you any further in life.

(*Id.* at 54-55).

On August 2, 2023, the court entered dispositional orders changing Children's permanency goals from reunification to adoption. The orders did not provide Mother with any periods of visitation. On August 21, 2023, Mother timely filed separate notices of appeal and concise statements of errors complained of on appeal. This Court consolidated the matters *sua sponte* on September 8, 2023.

Mother now raises two issues for our review:

Whether the juvenile court committed an abuse of discretion and/or error of law when it determined that the agency established, by clear and convincing evidence, that a permanency goal of reunification was not feasible and established the grounds for an establishment of a goal of adoption at the dispositional hearing…?

Whether the juvenile court committed an abuse of discretion and/or error of law when it concluded that the agency had established, by clear and convincing evidence, that the agency shall no longer provide services, including visitation, to [Mother]?

(Mother's Brief at 3).

Mother's issues are related, and we address them together. Mother argues that the purpose of the Juvenile Act is to preserve the family unit, and reunification may occur even where a court finds aggravated circumstances.

- 8 -

Mother asserts she should have the opportunity to reunite with Children because "[t]his family had no prior agency involvement until September 2021[.]" (*Id.* at 8). Additionally, Mother insists that OCY did not prove that she completely lacked the capacity to remedy her circumstances. Mother explains that she recently obtained employment, independent housing, a driver's license, and a cell phone. Moreover, Mother emphasizes that OCY "failed to connect the past alleged severity of the case to the feasibility of [M]other to prospectively achieve reunification." (*Id.* at 9).

Even though reunification is no longer the goal, Mother argues visitation remains in Children's best interests. If her parental rights are not terminated, Mother claims her relationship with Children would suffer from the lack of visitation. Mother also insists that she should receive services to improve her parenting skills and mental health. Mother concludes that the court abused its discretion when it changed the goal to adoption and suspended all visitation and services. We disagree.

On appeal, goal change decisions are subject to an abuse of discretion standard of review. *In re N.C.*, 909 A.2d 818, 822 (Pa.Super. 2006).

> In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was "manifestly unreasonable," that the court did not apply the law, or that the court's action was "a result of partiality, prejudice, bias or ill will," as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witness and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to

believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm, "even if the record could also support an opposite result."

*Id.* at 822–23 (internal citations omitted).

The Juvenile Act controls the disposition of dependent children. *See In re R.P.*, 957 A.2d 1205, 1217 (Pa.Super. 2008). Section 6351 provides in relevant part:

**§ 6351. Disposition of dependent child**

\* \* \*

**(f) Matters to be determined at permanency hearing.**—At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

- 10 -

\* \* \*

(9)     If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i)        the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii)        the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii)        the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

(10)   If a sibling of a child has been removed from his home and is in a different placement setting than the child, whether reasonable efforts have been made to place the child and the sibling of the child together or whether such joint placement is contrary to the safety or well-being of the child or sibling.

(11)   If the child has a sibling, whether visitation of the child with that sibling is occurring no less than twice a month, unless a finding is made that visitation is contrary to the safety or well-being of the child or sibling.

(12)   If the child has been placed with a caregiver, whether the child is being provided with regular, ongoing opportunities to participate in age-appropriate

or developmentally appropriate activities. In order to make the determination under this paragraph, the county agency shall document the steps it has taken to ensure that:

>(i)     the caregiver is following the reasonable and prudent parent standard; and

>(ii)     the child has regular, ongoing opportunities to engage in age-appropriate or developmentally appropriate activities. The county agency shall consult with the child regarding opportunities to engage in such activities.

\*     \*     \*

**(f.1) Additional determination.**—Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1)     If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2)     If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(3)     If and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(4)     If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for

adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

\* \* \*

**(f.2) Evidence**.—Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including evidence of the use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk, shall be presented to the court by the county agency or any other party at any disposition or permanency hearing whether or not the conduct was the basis for the determination of dependency.

**(g) Court order**.—On the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f), (f.1), (f.2), (g).

"Pursuant to the Juvenile Act, if a court finds that aggravated circumstances exist in a given case, the court must then 'determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made….'" ***In re L.V.***, 127 A.3d 831, 839 (Pa.Super. 2015) (quoting 42 Pa.C.S.A. § 6341(c.1)). "A court may end reasonable efforts at its discretion." ***Id.*** The Juvenile Act defines "aggravated circumstances," in relevant part, as follows:

**"Aggravated circumstances."** Any of the following circumstances:

\* \* \*

- 13 -

> (2) The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent.

42 Pa.C.S.A. § 6302. The Juvenile Act also defines "aggravated physical neglect" as "[a]ny omission in the care of a child which results in a life-threatening condition or seriously impairs the child's functioning." *Id.*

Additionally, the standard by which the court must determine whether to grant visitation to a parent is dependent upon the placement goal mandated in the family service plan. *See In re C.B.*, 861 A.2d 287, 293 (Pa.Super. 2004), *appeal denied*, 582 Pa. 692, 871 A.2d 187 (2005). "Where … reunification still remains the goal of the family service plan, visitation will not be denied or reduced unless it poses a grave threat." *Id.* (citation omitted). "If … the goal is no longer reunification of the family, then visitation may be limited or denied if it is in the best interests of the child or children." *Id.* "The 'best interests' standard, in this context, is less protective of parents' visitation rights than the 'grave threat' standard." *In re B.G.*, 774 A.2d 757, 760 (Pa.Super. 2001) (citation omitted).

> To determine whether visitation is in the child's best interest the court may consider all evidence relating to the child's best interest including but not limited to the following factors: (1) length of separation from natural parents; (2) effect of visitation on the child; (3) the age, sex and health of the child; (4) the emotional relationship between child and parents; (5) the special needs of the child; and (6) the effect on the child's relationship with the current caregiver, usually the foster parents. Most importantly, the focus must be on the best interests of the child, in light of the fact that

- 14 -

the natural family is not likely to be reunited.

*In Interest of M.B.*, 674 A.2d 702, 706 (Pa.Super. 1996).

Instantly, the court determined that a goal change to adoption was in

Children's best interests:

> The record reflects the family was opened for services with [OCY] approximately one year before the Children's removal. [OCY] attempted to assist the parents with obtaining birth certificates for the three younger Children. Mother and Father were an intact couple and failed to follow through with obtaining the proper documentation to move forward with obtaining the birth certificates. As a result, the younger children were not eligible to receive medical, dental, or early intervention services. S.R., who was (7) years old at the time of the removal, had a birth certificate and social security card, yet he had never been to the dentist. He had attended one doctor's appointment in his life at the direction of [OCY]. Additionally, S.R. had not received any early intervention services, had never been enrolled in school, and had never undergone any cognitive testing despite his clear communication delays.
>
> The overwhelming evidence in this matter exhibits these Children were the victims of serious physical neglect at the hands of their Mother and Father. Evidence that neither parent opposes; in fact, Ms. Bernardini credibly testified that when she asked Mother what happened, Mother responded that she neglected the Children because Father neglected her.
>
> Furthermore, Mother has taken no accountability for her involvement, as reflected in the letter she wrote [OCY], stating, *inter alia*, that the Children's teeth were rotten because she asked "[Father] and his parents to help her brush the [Children's] teeth. But they never did."
>
> Mother has not only demonstrated an unwillingness or inability to meet her Children's basic needs but also an inability to comprehend how severely her actions have mentally, physically, and educationally impacted the Children's health, growth, and development. Mother's

actions and inactions placed the Children in danger, and her lack of accountability continues to place the Children, who are making progress in their respective foster homes, in danger.

(Trial Court Opinion at 17-18).

Our review of the record confirms that competent evidence supported the court's findings. *See In re N.C., supra*. Based on the testimony from OCY's witnesses, the court determined that Children suffered from aggravated physical neglect. As such, the court correctly found that aggravated circumstances warranted the cessation of reasonable efforts at reunification. *See In re L.V., supra*. The record also supports the court's determination that suspending Mother's visitation was in Children's best interests. *See In re C.B., supra*. Ultimately, the court could not subordinate Children's present need for permanence and stability to Mother's hope to remedy her circumstances in the future. Accordingly, we affirm.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

FILED: 4/4/2024