460 A.2d 1196

**In re DAMON B.**

**Appeal of JOAN B.**

Superior Court of Pennsylvania.

Argued Jan. 12, 1983.

Filed May 27, 1983.

Lorraine D. Taylor, McKeesport, for appellant.

Marc Salo Drier, Pittsburgh, for appellee.

Michaele Krepinevich and Richard S. Levine, Pittsburgh, for Krapinevich, participating parties.

James A. Esler, Assistant City Solicitor, Pittsburgh, for Children, participating party.

Before POPOVICH, MONTGOMERY and VAN der VOORT, JJ.

PER CURIAM:

This is an appeal by Joan B., natural mother of Damon B., from an order reducing her visitation rights from twice a month to once every ninety days.

Damon B. was born on June 16, 1977. He and his six siblings were adjudicated dependent on February 15, 1978, because of generally unsanitary conditions in the home. The children were returned to Joan B. under the supervision of Children and Youth Services. However, the problems continued and Damon was again removed, first to a shelter on September 12, 1978, then to the foster home of Mr. and Mrs. K. on October 3, 1978, where he still resides. Joan B. visited Damon on a regular once-a-month schedule until

January 1981, when the visits increased to twice a month in contemplation of Damon's eventual return to Joan B. At approximately the same time, the visits became erratic due to cancellations by the foster parents. On May 21, 1981, Joan B. filed a petition for review and enforcement of her visitation rights. Hearings were held on this petition on June 17, 1981, September 9, 1981, and October 30, 1981. Twice-a-month visitation was ordered pending the final decision. Although no formal petition was filed by the foster parents, they were represented by counsel and the court and all parties treated the matter as if they had petitioned for a decrease or cessation of visitation. On September 9, 1981, the foster parents filed a Notice of Intention to Adopt Damon.

Most of the testimony consisted of evaluations by two clinical psychologists of Damon and his interaction with his foster parents and his natural mother. At the October 30 hearing, testimony was also given by Joan B., Mr. K. (the foster father), and Dolores McCall, Joan B.'s caseworker who had supervised the visits. Both psychologists testified extensively about Damon's strong psychological bonds to his foster parents, his inability to relate well to his natural mother during the visits they observed, and the stress caused by the visits, which included nightmares, enuresis, irrational fear of Joan B., and expressions of rage in his behavior. Both recommended ceasing or, at least, reducing visitation and stated that it was in Damon's best interest to remain with the foster parents. The primary reason for this recommendation was because Damon had formed such a strong psychological bond with the foster parents. Mr. K. testified that Damon had always had problems with the visits but that these problems had significantly worsened when the visits became more frequent. He made clear his and Mrs. K.'s desire to adopt Damon. He also stated that he was not in favor of returning Damon to his natural mother and felt no duty to try to reunite Damon with his natural family. On the other hand, both Joan B. and her caseworker testified that Damon's failure to relate to his natural mother was of fairly recent origin and that Damon's

behavior as observed by the psychologists was quite different from his behavior during visits observed by Ms. McCall. Joan B. also testified that she had completed a Parent Effectiveness Training course and had done volunteer work with parents and children in an effort to improve her parenting skills and regain custody of her children, two of whom had already been returned to her.

The hearing judge found that Joan B. had indeed improved her parenting and housekeeping skills and that the two children currently in her custody are receiving adequate care. However, he also found that Damon had formed such a strong psychological bond with his foster family that it was unlikely he could ever develop a close relationship with his natural family and that removal from the foster home would cause serious emotional harm to him. His order, dated November 23, 1981, provided for visitation every ninety days and directed CYS to formulate a new permanency plan "consistent with the findings of this Court." Joan B.'s motion for reconsideration was denied and review of the original order was scheduled for June 23, 1982. This appeal followed.

On appeal Joan B. first argues that a natural parent's right to visitation can be limited or denied only if the parent has been found to possess severe mental or moral deficiencies that constitute a grave threat to the welfare of the child. *Commonwealth ex rel. Peterson v. Hayes*, 252 Pa. Super. 487, 381 A.2d 1311 (1977). The trial judge specifically found a lack of evidence substantiating any such deficiencies. (Op. p. 5). Appellees argue that the appropriate standard is the best interest of the child.

The best interest standard has long been the guiding principle in determining custody cases. *Commonwealth ex rel. Bender v. Bender*, 197 Pa.Super. 397, 178 A.2d 779 (1962). In dealing with visitation rights, however, the stricter "grave threat" standard has long prevailed.

> Only when the evidence clearly shows that a mother is unfit to associate with her children should she be denied the right to see them. *Commonwealth ex rel. Turner v. Strange*, 179 Pa.Super. 83, 115 A.2d 885 (1955).

Even partial custody which more closely resembles visitation than custody is determined under the stricter standard. *Scott v. Scott,* 240 Pa.Super. 65, 368 A.2d 288 (1976) (concurring opinion of Spaeth, J.). In the instant case, we are dealing strictly with visitation rights; for the most part, visits took place at CYS offices, they were only a few hours long, and, at most, took place twice a month. Therefore we agree that the best interest standard is inappropriate.

This error, however, does not necessarily require that we reverse the order reducing visitation, since we may affirm an order for reasons other than those given by the trial court. *Weber v. Lynch,* 237 Pa.Super. 48, 346 A.2d 363 (1975); *In re King's Estate,* 183 Pa.Super. 190, 130 A.2d 245 (1957). In rare instances, we have approved restricting or *temporarily* suspending visitation even though there has been no showing of such severe mental or moral deficiencies in the parent as would constitute a grave threat to the child's welfare. *See, Dile v. Dile,* 284 Pa.Super. 459, 426 A.2d 137 (1981); *Lewis v. Lewis,* 271 Pa.Super. 519, 414 A.2d 375 (1979); *Morris v. Morris,* 271 Pa.Super. 19, 412 A.2d 139 (1979). We believe this is just such a rare case. Both psychologists testified, in answer to a hypothetical question from the hearing judge, that visitation should be suspended or radically reduced for the next six months even if, at the end of that time, it were determined to return Damon to his natural mother; that the visits were presently counterproductive to Damon's development of any bond with his natural mother; and that the stress experienced by Damon was unusually severe. In addition, the reduction in visits was a temporary one, limited in time by the review hearing scheduled within the next seven months.[1] Therefore, we affirm that portion of the trial court's order limiting Joan B.'s visitation to once every ninety days.

1. Our decision in this case is influenced by the fact that this is a temporary reduction in visits rather than a long-term cessation of visits. In the latter case, of course, the trial court *must* find, by clear and convincing evidence, that visitation poses a grave threat to the child. *In Interest of Rhine,* 310 Pa.Super. 275, 456 A.2d 608 (1983).

■ The other two issues raised by Joan B. in this appeal are: (1) that there was insufficient evidence to support that portion of the trial court's order directing formulation of a permanency plan precluding Damon's return to his natural mother;[2] and (2) that the trial court should have ordered counseling and other remedial services to attempt to reunite Damon and his natural mother. The hearings below arose because of Joan B.'s petition to enforce her visitation rights. No permanency plan was then before the court for review. No request for counseling was made by any of the parties. There was no indication that counseling or other remedial services were part of any plan proposed by Children and Youth Services, or that any services suggested by them were rejected by any of the parties. The hearings were specifically limited to the narrow issue of "what is best for this child for the next 180 days." (N.T. 10/30/81, p. 9) It is apparent from the record that the parties limited the evidence they presented to the issue of whether Joan B.'s visitations with Damon should be increased, decreased or suspended for the following six months.[3] Evidence was not presented on the feasibility of a particular permanency plan or on the need or usefulness of counseling.

In other contexts, it has been held that a court should not grant relief on an issue when such relief has not been requested during trial. *Tagnani v. Lew*, 493 Pa. 371, 426 A.2d 595 (1981). "Orderly judicial procedure requires that nothing more be passed upon by a court than the justiciable

**2.** The precise language of the order is "to formulate a new permanency plan consistent with the findings of this court." When read in conjunction with the trial court's opinion, the clear implication is that Damon is not to be returned to the custody of his natural mother.

**3.** For example, present at the October 30, 1981 hearing was one witness scheduled to testify for Joan B. who did not testify after the following exchange between the hearing judge and counsel:
THE COURT: Mr. Sandow, do you believe the testimony of Mrs. Powell is relevant to the narrow issue that we have raised?
MR. SANDOW: Well, Your Honor, to the extent that we are talking about the narrow issue, we are willing to not hear testimony here today. . . .

question posed for its decision." *School District of Robinson Township v. Houghton*, 387 Pa. 236, 240, 128 A.2d 58, 60 (1957). This is especially true in the present context where we are dealing with familial rights, an area into which the state can intrude only with caution and restraint. *In re Custody of Frank*, 283 Pa.Super. 229, 423 A.2d 1229 (1980). In addition, we note that a full and complete record and comprehensive opinion are required for us to review a custody decision. *In re Custody of White*, 270 Pa.Super. 165, 411 A.2d 231 (1979). Since the court and the parties limited the hearings in this case to the narrow issue of visitation, we do not have such a record as would enable us to say that custody of Damon should be with one party or the other. *See, e.g. In re Desiree B.*, 304 Pa.Super. 461, 450 A.2d 1003 (1982). Therefore, to the extent that the order appealed from goes beyond the determination of Joan B.'s visitations with Damon, we must vacate it.

Order affirmed as to visitation with the natural mother and vacated as to formulation of a new permanency plan consistent with the trial court's findings. Case remanded for further consideration. We do not retain jurisdiction.