J-S05029-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF J.A., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.R. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1451 WDA 2018 |

Appeal from the Order Entered September 17, 2018
In the Court of Common Pleas of Lawrence County Civil Division at
No(s):  CP-37-DP-0000095-2013

| | | |
|---|---|---|
| IN THE INTEREST OF K.R., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.R. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1452 WDA 2018 |

Appeal from the Order Entered September 17, 2018
In the Court of Common Pleas of Lawrence County Civil Division at
No(s):  CP-37-DP-94-2013

BEFORE: PANELLA, P.J., NICHOLS, J., and STRASSBURGER[*], J.

MEMORANDUM BY NICHOLS, J.:                    **FILED MAY 23, 2019**

M.R. (Mother) appeals from the permanency review orders regarding her two minor daughters, K.R. (born November 2001) and J.A. (born January 2005) (collectively, the Children).[1]  We vacate the orders appealed from and

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] C.A. (Father) has not appealed these orders.

remand for a determination of whether good cause exists for the Children's absence from the hearing.

We adopt the facts and procedural history set forth in the trial court's opinion, which are supported by the record. *See* Trial Ct. Op., 11/2/18, at 1-8. On April 11, 2017, CYS caseworkers filed petitions to involuntarily terminate the parental rights of Mother and Father pursuant to 23 Pa.C.S. § 2511(a)(2), (8), and (b), and motions to change the Children's permanency goals to adoption.[2] Further permanency review hearings were convened in September 2017, March 2018, and September 2018.

At the conclusion of the permanency review hearings, the court entered an order finding (1) continued placement of the Children was necessary and appropriate; (2) that the Children had been consulted and wished to remain in placement;[3] and (3) that there was no compliance with the permanency plan as to Mother because the termination hearing had been completed, but that the court was awaiting briefs from counsel prior to making its decision. *See* Order, CP-37-DP-94-2013, 9/17/18, at 1; Order, CP-37-DP-95-2013, 9/17/18, at 1. The orders also noted that the Children did not wish to visit with Mother, due to the lack of resolution regarding Mother's understanding of abuse in their lives. Order, CP-37-DP-94-2013, 9/17/18, at 6; Order, CP-

---

[2] The termination petitions remain pending at the time of the instant appeal.

[3] Although the Children's counsel was present, the Children were not.

37-DP-95-2013, 9/17/18, at 6. As of September 17, 2018, the Children's primary placement goal was reunification with parent, with a concurrent placement goal of adoption.

Mother timely filed an appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother raises the following issues for our review:

[1]. Whether [CYS] failed to make children available to the [c]ourt as required and as mandated by the Child Protective Services Laws (CPSL)[?]

[2]. Whether [Mother] completed all services required by [CYS] and the [c]ourt failed to apply the law to the facts of the case and return the children to [Mother?]

[3]. Whether [CYS] failed to provide any type of reunification counseling and generate a service plan to reunify [Children] with [Mother] considering that all other required services were completed by [Mother?]

[4]. Whether [CYS] failed to provide visits between [Mother] and [C]hildren, based solely on the alleged belief that one of the two children voiced her desire to not see [Mother] and [CYS] failed to provide competent evidence that there was any basis to deny [M]other visitation[?]

[5]. Whether the [c]ourt failed to take testimony from both children regarding their individual desire to reunify with [Mother] thereby requiring the [c]ourt to make a decision as to both children based upon the unsubstantiated testimony of one child, while the other was withheld from the [c]ourt without justification[?]

Mother's Brief at xxi-xxii.

Prior to reaching the merits of Mother's issues, we must determine whether we have jurisdiction to decide the instant appeal. In particular, we

must determine whether the orders in question—the permanency review orders of September 17, 2018—are appealable orders. CYS filed a motion to quash the instant appeal, arguing that the orders were not final and appealable. On December 13, 2018, this Court denied CYS's motion without prejudice, to be re-raised before a merits panel or in a subsequent motion. As of the date of the filing of the instant memorandum, CYS has filed neither a brief nor a renewed motion to quash.

Because "we lack jurisdiction over an unappealable order[,] it is incumbent on us to determine, *sua sponte* when necessary, whether the appeal is taken from an appealable order.'" *Gunn v. Auto. Ins. Co. of Hartford, Conn.*, 971 A.2d 505, 508 (Pa. Super. 2009) (citation and quotation marks omitted). It is well-settled that "[a]n appeal lies only from a final order, unless permitted by rule or statute." *Stewart v. Foxworth*, 65 A.3d 468, 471 (Pa. Super. 2013); *see generally* Pa.R.A.P. 341(b). Here, because an "order granting or denying a status change, as well as an order terminating or preserving parental rights, [is] deemed final when entered," we review the merits of the orders appealed from. *See In re H.S.W.C.-B.*, 836 A.2d 908, 911 (Pa. 2003).[4] Accordingly, we review the merits of Mother's appeal.

---

[4] In *In re J.S.*, 795 A.2d 985 (Pa. Super. 2001), following a permanency review hearing, the trial court entered an order that "did not change the placement goal or order a change in custody." *In re J.S.*, 795 A.2d at 986-

- 4 -

Initially, although her brief raises five issues, Mother's arguments are intertwined and may be grouped into three categories. We summarize the first category as follows. Mother argues that the court failed to make the Children available to testify in court regarding their individual desire to reunify with Mother; she also challenges CYS's alleged failure to provide competent evidence to that effect and CYS's improper attempts to shift the burden of proof to Mother. *See* Mother's Brief at 4-12. Mother claims that the Children's presence is required by the CPSL and Rules of Juvenile Court Procedure. *Id.* at 4.[5] Mother also avers that because the Children did not testify, the trial court could not make a reasoned opinion regarding the well-being, needs, or desired course of reunification of the Children. *Id.* at 11. She asserts that because of the lack of the Children's testimony, CYS did not produce competent evidence that reunification was not an appropriate goal and that visitation should remain suspended. *Id.* at 4-11. In support, Mother cites to 237 Pa. Code 1128, Pa.R.J.C.P. 1128, Pa.R.J.C.P. 1129(a)(2), and the

---

87. This Court quashed the appeal because the order maintained the status quo and was a non-appealable interlocutory order. *Id.* at 987. The Pennsylvania Supreme Court explicitly disapproved the reasoning of *In re J.S.*, holding, "orders that are not status-changing have been regularly reviewed not only by the Superior Court, but also by this Court." *In re H.S.W.C.-B.*, 836 A.2d at 910 (citations omitted).

[5] Mother did not cite to the particular provision within the Child Protective Services Law, 23 Pa.C.S. §§ 6301-6385, that she claims supports her argument.

Pennsylvania Dependency Benchbook, revised in 2014,[6] to support her

arguments. *Id.* at i-ii.

In dependency matters,

> [t]he standard of review . . . requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

"Questions concerning the admission and exclusion of evidence are

within the sound discretion of the trial court and will not be reversed on appeal

absent an abuse of discretion." *In re R.T.*, 778 A.2d 670, 683 (Pa. Super.

2001) (internal quotation marks and citation omitted). During dependency

proceedings,

> the Juvenile Act permits broad discretion in the admission of evidence in dependency proceedings. Section 6341(d), Evidence on issue of disposition, allows the admission of "all evidence helpful in determining the questions presented," including oral and written reports, during a disposition review hearing.

*In re A.H.*, 763 A.2d 873, 880 (Pa. Super. 2000) (emphasis omitted).

---

[6] The Pennsylvania Dependency Benchbook is a compendium on Pennsylvania dependency law that provides an overview of the subject for juvenile court judges to refer to while presiding over a case. It is not "intended to be construed as legal advice or considered a substitute for statutory, procedural or other legal authority." *See* Pennsylvania Dependency Benchbook, Office of Children and Families in the Courts, 2014; *see also In Interest of L.T.*, 158 A.3d 1266, 1278 (Pa. Super. 2017) (noting that the Juvenile Act remains dispositive in dependency cases).

The Juvenile Act provides that during permanency hearings and while fashioning a permanency plan, "the court shall consult with the child regarding the child's permanency plan, including the child's desired permanency goal, in a manner appropriate to the child's age and maturity." 42 Pa.C.S. § 6351(e). If the court does not personally consult with the child, then the court must ensure the child's views have been communicated to the court by the child's guardian *ad litem* or legal counsel. **Id.**

Rule of Juvenile Court Procedure 1128 provides that all "parties shall be present at any proceeding" unless one of two exceptions apply. Pa.R.J.C.P. 1128(A). In relevant part, the "court may proceed in the absence of a party upon good cause shown," except that no hearing can occur without the presence of the child's guardian *ad litem* or legal counsel, or both. Pa.R.J.C.P. 1128(B)(1). The comment to the rule provides that "unless good cause is shown, a child should appear in court. It is important that all children, including infants, appear in court so the court can observe the interaction between the caregiver and child and observe the child's development and health." **Id.** cmt. Indeed, Rule 1129(A)(2) provides that at "a minimum, a child shall appear in person at least every six months unless as otherwise provided by Rule 1128." Pa.R.J.C.P. 1129(A)(2).

Here, K.R. last appeared in court in May 2017, sixteen months before the permanency hearing at issue.[7] ***See id.*** While the court may excuse the Children's appearance upon a showing of good cause, the trial court here did not justify their absence from the hearing. ***See generally*** Pa.R.J.C.P. 1128 cmt.; Pa.R.J.C.P. 1129. Under the circumstances, we vacate the orders and remand to have the juvenile court address the Children's non-attendance and render a finding of good cause to excuse the Children from attending, as needed.[8]

Orders vacated. Case remanded. Jurisdiction relinquished.

President Judge Panella joins the memorandum.

Judge Strassburger files a concurring and dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/23/2019

---

[7] M.R., the other child, last appeared in court on May 23, 2018, six months before the permanency hearing.

[8] Nothing in our decision prevents the Juvenile Court from again entering the orders appealed from upon a determination of good cause or otherwise holding a new permanency review hearing at which the Children would be present.

IN THE INTEREST OF:        : IN THE COURT OF COMMON PLEAS

                           : LAWRENCE COUNTY, PENNSYLVANIA

K.M.R.                     : NO. 94 OF 2013, DP

J.L.A.                     : NO. 95 OF 2013, DP

## APPEARANCES

For Children and Youth Services:
Carolyn Flannery, Esq.
1001 East Washington Street
New Castle, PA 16101

For Natural Mother:
Dennis McCurdy, Esq.
539 Main Street
Harmony, PA 16037

For Natural Father:
Bradley G. Olson, Jr., Esq.
28 North Mill Street
New Castle, PA 16101

For the Minors:
Paula Cialella, Esq.
113 N. Mercer Street
New Castle, PA 16101

Guardian Ad Litem:
Nora DiBuono, Esq.
701 First Avenue
Ellwood City, PA 16117

## OPINION

Hodge, J.                                    November 2, 2018

Presently before the Superior Court are the appeals of (Mother), the

mother of (K.M.R.) and (J.L.A.) (collectively,

Children), to this Court's Permanency Review Orders (PRO) dated September 17,

53RD JUDICIAL DISTRICT

AWRENCE COUNTY PENNSYLVANIA

FILED/ORIGINAL
2018 NOV -5 AM 11: 24
JODI KLABON-ESOLDO
PRO AND CLERK

FILED/ORIGINAL
2018 NOV -5 PM 1: 20
JODI KLABON-ESOLDO
PRO AND CLERK

2018.[1]  For the reasons in this opinion, issued pursuant to Pa. R.A.P. 1925(a), we respectfully request that the Superior Court affirm our Order and dismiss this appeal.

## Procedural History

The Children were first taken into emergency care by an order of this Court dated November 4, 2013. Upon the petition of Lawrence County Child and Youth Services (CYS), on November 21, 2013, this Court adjudicated both Children dependent based on evidence presented that the natural father of Children had physically assaulted Mother with Children present and that Mother's home had deplorable conditions. Accordingly, this Court assigned legal and physical custody of Children to CYS. Since then, this Court has conducted permanency review hearings approximately every six months and has continued to find Children dependent, as documented by earlier PROs dated May 27, 2014, January 6, 2015, September 9, 2015, March 11, 2016, August 31, 2016, March 16, 2017, September 25, 2017, and March 23, 2018. Meanwhile, CYS filed a Motion for Goal Change from reunification to adoption as to both parents on April 11, 2017, which remains pending before this Court. That same date, CYS filed a Petition to Involuntarily Terminate Parental Rights as to both parents, filed at docket numbers OC-A 20011/20012 of 2017, the proceedings for which have been scheduled concurrently with the recurring permanency hearings triggering the instant appeal.

It is the most recent PRO, issued by this Court on September 17, 2018, after a permanency review hearing on the same date, which is the subject of the instant appeal.

---

[1] Although K.M.R. and J.L.A. are full sisters, their dependency cases remain at two separate docket numbers, i.e. DP 94 of 2013 and DP 95 of 2013, respectively, and have only been consolidated for scheduling purposes in accordance with Pa. J.C.R.P. 1333. In the interest of simplicity, however, we will refer to the two PROs and appeals in the singular sense.

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

FILED/ORIGINAL

2018 NOV -5 AM 11: 24

JODI KLABON-ESOLDO
PRO AND CLERK

2018 NOV -5 PM 1: 40

JODI KLABON-ESOLDO
PRO AND CLERK

On October 5, 2018, Mother filed an appeal to the Superior Court of our PRO of September 17, 2018, with a Concise Statement of Matters Complained of on Appeal.[2]

Factual Background

Because this case dates back to 2013, the factual record is quite extensive. Accordingly, this Court will highlight the most salient facts relating to the instant appeal, with particular attention paid to the circumstances that initially resulted in Children's removal from the home and the testimony taken at subsequent permanency hearings.

Children, K.M.R. and J.L.A., are two females both born to Mother and their natural father,             K.M.R. was born on November 6, 2001, while J.L.A. was born on January 18, 2006. Although never married to Father, Mother maintained a residence with Children in New Castle, PA, at which Father spent significant amounts of time. Children first came to the attention of CYS following an incident at this home on November 2, 2013. On that date, and within sight of Children, Father beat Mother so badly that her lungs suffered internal bleeding and so severely that she had to be flown to Pittsburgh via helicopter for medical treatment. Notes of Testimony, March 23, 2017, at 16. The Pennsylvania State Police subsequently arrested and charged Father for the assault. It was during this police response to Mother's residence that state troopers observed the household's "deplorable" conditions. Dependency Petition, November 15, 2013, at 3. Based on this hazardous physical environment and the lack of any parental supervision (a result of Father's incarceration and Mother's hospital stay in Pittsburgh), the state police referred the children to CYS, who immediately obtained an order from

53RD
JUDICIAL
DISTRICT

AWRENCE COUNTY
PENNSYLVANIA

---

[2] Father is not a party to this appeal.

FILED/ORIGINAL FILED/ORIGINAL

2018 NOV -5 AM II: 24 2018 NOV -5 PM 1: 50

JODI KLABON-ESOLDO KLABON-ESOLDO
PRO AND CLERK PRO AND CLERK

this Court on November 4, 2013, securing emergency custody of the children. Order of Court, November 4, 2013.

This Court, upon consideration of the dependency petition, adjudicated Children dependent on November 21, 2013, and took further action as to their placement through a Dispositional Order dated December 5, 2013.[3] Pursuant to these orders, CYS placed Children with foster families, and Children have remained with the same foster family since December 14, 2013. Petitioner's Exhibit 1, 9/17/18. By April 2014, CYS developed the initial family service plan (FSP), an extensive list of criteria in which Mother would have to improve, including, *inter alia*: maintaining a clean home with working utilities; obtaining and completing mental health treatments; receiving counseling for domestic violence; completing a parental capacity assessment through a CYS-approved provider; and completing parenting classes. Id. The ultimate goal of the FSP was reunification between Mother and Children. Id. In the months and years that followed, Mother made some progress with the FSP, such as cleaning up her home and completing mental health assessments. Additionally, Mother and Children participated in supervised visits and family therapy sessions initially designed to promote healing and reconciliation, but most importantly, reunification. N.T. 3/23/17 at 65.

However, it later became apparent that the biggest barrier to reunification was not the physical environment of Mother's home but the utter lack of any emotional connection and relationship between her and Children, particularly with K.M.R. As relayed through both her own testimony and that of her therapists at multiple hearings,

---

[3] The Pennsylvania Juvenile Act (Juvenile Act), 42 Pa. C.S. §6301 et seq., defines dependency as, *inter alia*, "a child who…is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 42 Pa. C.S. §6302. Dependency is a judicial determination. 42 Pa. C.S. §6341(a).

K.M.R. characterized her childhood as one full of family dysfunction and abuse that Mother refused to acknowledge.

First, K.M.R. recounted abusive behavior exhibited by Father besides the violent outburst that first brought Children to CYS' attention, noting that Father had physically harmed her and Mother on multiple occasions, including one episode in which Father deliberately sprayed K.M.R. in the eyes with pepper spray. Id. at 20. She also recounted Father's extensive issues with drugs and alcohol, ranging from heavy drinking to using drugs requiring a syringe and needle that resulted in drug paraphernalia being scattered about Mother's home. Id. at 31. Even with these seemingly obvious indicators of trouble, K.M.R. felt that Mother "put blinders on," enabling, facilitating, or outright ignoring Father's destructive drug and alcohol-fueled habits despite the clear danger they presented to Children's well-being and despite numerous opportunities to end their on-again, off-again relationship. Id. Even after Children were removed from Mother's home, K.M.R. felt that Mother lied in therapy sessions about the extent of any of Father's abuse, whether inflicted on herself or Children, and pretended that she was unaware of any household issues. Id. at 29.

K.M.R. has also expanded on what she felt were Mother's own shortcomings in promoting Children's educational, social, and moral development. Commenting on Mother's choice to have Children homeschooled, K.M.R. described the quality of instruction as "not very good" and consisting of only a few hours of lessons per week, and a reason that she had "very bad" reading skills that were several grade levels below other children her age. Id. at 26. Seemingly aware of K.M.R.'s lack of progress, Mother even completed assignments and tests for K.M.R. so that she would be able to move on

to the next grade level. Id. at 27. One lesson that stuck with K.M.R., however, was Mother's attempts to teach Children to steal, noting that Mother had been banned from stores for shoplifting and that Mother at one point encouraged J.L.A. to outright take a doll from a department store without paying. Id. at 52. Additionally, K.M.R. relayed that Mother and Father failed to attend to Children's basic needs, such as feeding, which required her to take the lead in preparing meals for herself and J.L.A. as well as performing much of the housework. Id.

Besides the difficulties K.M.R. experienced with her own parents, she alleged that she suffered sexual abuse by a now deceased neighbor, David Anderson, which resulted in a Pennsylvania State Police criminal investigation. Id. at 51. While K.M.R. admitted that she did not inform Mother of the sexual abuse as it took place, the alleged sexual abuse has been part of the discussions of trauma that have taken place at the various counseling sessions facilitated by CYS.

Following their initial removal from Mother's home, Children have remained with the same foster family since December 14, 2013. Their foster family enrolled them in public school at Mohawk School District, where K.M.R. has made steady progress in academics and socialization, achieving good grades and satisfactorily completing grade level work, as well as becoming involved in many extracurricular activities. Id. at 22. K.M.R. has also expressed feelings of affection and safety for herself and J.L.A. with her foster family that she never felt with Mother, and has even stated that she would like to be adopted by her foster family. K.M.R. has voiced that she has no desire to return to living with Mother full time. Id. at 47.

Meanwhile, CYS implemented the FSP with a goal of eventual reunification, and these efforts included periodic, supervised visits between Children and Mother, and individual and group counseling, although regular visits with Mother have not occurred since 2014. Order of Court, January 6, 2015. Some parts of the FSP have been successful; as noted, Mother has improved her home and completed various mental health screenings. Petitioner's Exhibit 1, 9/17/18. In other respects, progress has been more tentative. In early supervised visits, for example, CYS caseworker Kristen Pauline, who was the initial caseworker in November 2013, testified that she observed Mother discuss inappropriate topics in front of Children that resulted in anger and frustration on both sides before eventually "[simmering] down some" in later visits. N.T. 8/28/18 at 18. Additionally, the initial parental capacity assessment that Mother completed in December 2014 laid bare the emotional chasm between her and Children that would have to be worked out: "[Mother] exhibits limits in her emotional, cognitive, and behavioral capacity...the relationship [with Children] is impaired emotionally...[Mother] did not acknowledge the traumas [Children] have experienced. [This] is an emotional safety concern for [Children]." Petitioner's Exhibit 1, 9/17/18.

To this end, Mother and Children have attended therapy sessions together with several counselors since 2014 to work through their issues and, as with the supervised visits and other aspects of the FSP, there has been some progress made, such as K.M.R. successfully reducing the "amount of anger, frustration and resentment towards [Mother]," and Mother working on her "ability to attune to feelings, connect with [Children and] understand their trauma experience." N.T. 3/18/17 at 66-67. However, therapist Tanya Stahlman, who has worked with Mother and Children since 2015, testified at the

53RD
JUDICIAL
DISTRICT

LWRENCE COUNTY
PENNSYLVANIA

7

March 2017 permanency hearing that there was much room for improvement in "the development of positive feelings [and] connecting those attachments [between Mother and Children]." Id. Indeed, with respect to J.L.A., the tone of interactions between her and Mother at therapy was positive on a surface level but Ms. Stahlman noted a "stagnant, frozen ability" to form any deeper connections. Id. at 70. The scope of the therapy sessions also changed under Ms. Stahlman when she, in reaction to K.M.R.'s hesitation and unwillingness to engage in the therapy, refocused the sessions from reunification with Mother to resolution, i.e. "[understanding] the circumstances that have happened to her, how [K.M.R. and Mother] talk about the traumatic experiences that they have had in relation to one another and then overcome those feelings." Id. Ms. Stahlman indicated that since this modification, K.M.R. has been much more responsive to the therapy sessions. Ms. Stahlman also stated that prior to any reunification, Mother would need to complete a second parental capacity evaluation. Id. However, despite repeated attempts since 2016, Mother has not completed her second parental capacity assessment through CYS. Testimony of Amber Pieri, 9/17/18.

Notwithstanding any isolated, positive interactions through the supervised visits or therapy sessions, K.M.R. has stated her view that, due to Mother's failure to acknowledge and protect Children from abusive and traumatic behavior, her relationship with Mother "can't be fixed" and that she has no desire to have further visits with Mother. N.T. 3/23/17 at 37, 48. For her part, Mother maintains that she has substantially complied with the FSP and should be further along on the path to reunification. Testimony of Mother, 9/17/18.

## Discussion

In her Statement of Matters Complained of on Appeal, Mother lists five alleged errors made by this Court:

1. Whether [CYS] failed to make [Children] available to the Court as required and as mandated by the Child Protective Services Laws (CPSL).

2. Whether [Mother] completed all services required by [CYS] and the Court failed to apply the law to the facts of the case and return [Children] to [Mother].

3. Whether [CYS] failed to provide any type of reunification counseling or generate a service plan to reunify children with [Mother]. [CYS] withheld [Children] and appropriate reunification services after all other required services were completed by [Mother]. The Court failed to apply the law to the facts on this matter.

4. Whether [CYS] failed to provide visits between [Mother] and [Children], based solely on the alleged belief that one of the two children voiced her desire not to see [Mother]. [CYS] failed to provide competent evidence that there was any basis to deny [Mother] visitation. The Court failed to apply the law to the facts on this manner.

5. Whether the Court failed to take testimony from both children regarding their individual desire to reunify with [Mother] thereby requiring the Court to make a decision as to both children based upon the unsubstantiated testimony of one child, while the other child was withheld from the Court without justification.

The appellate standard of review for dependency cases is abuse of discretion. In the Interest of C.K., 165 A.3d 935, 941 (Pa. Super. 2017) (internal citations omitted). Under this standard, the appellate court "must accept the facts as found by the trial court unless they are not supported by the record...we are not bound by the trial court's inferences, deductions, and conclusions therefrom..." Id. Indeed, an "abuse of discretion is not merely an error of judgment, but is, *inter alia*, a manifestly unreasonable judgment or a misapplication of law." Id. (citing In re J.R., 875 A.2d 1111, 1114 (Pa. Super. 2005) (internal citation omitted)).

I.    Whether [CYS] failed to make [Children] available to the Court as required and as mandated by the Child Protective Services Laws (CPSL).

Mother contends that CYS failed to make Children available to this Court as required by CPSL. After a thorough review by this Court, we find that Mother's complaint on this issue fails as a matter of law.

The CPSL, originally enacted by the General Assembly in 1990 and codified at 23 Pa. C.S. §§ 6301-6385, has a purpose to "encourage more complete reporting of suspected child abuse" and to enhance the capacity of each county to investigate and prosecute abusers while protecting and rehabilitating affected children. 23 Pa. C.S. §6302(b). While the CPSL broadens the powers and abilities of the child protective service agencies of each county, the statute makes no mention of any requirement that these agencies make children available to the court as claimed by Mother. Upon a thorough review of the CPSL, it is evident that any connection between it and

53RD
JUDICIAL
DISTRICT

WRENCE COUNTY
PENNSYLVANIA

10

permanency matters, and thus to the matter *sub judice*, is marginal. *See*, e.g. 23 Pa. C.S. §§6339, 6341(d). Perhaps the most important connection is found at 23 Pa. C.S. §6375(k), which decrees that each county agency (i.e. CYS) "shall maintain its responsibility for petitioning the court when necessary for the adjudication of a child pursuant to [the Juvenile Act]." In essence, this provision clarifies that in addition to the plethora of new responsibilities agencies like CYS gained under the CPSL, their previous powers to petition courts to find children dependent remained unaffected.

Clearly, and in our view fatal to Mother's first alleged error, the CPSL fails to make any mention of making children available to the court at all, let alone in the specific context of dependency proceedings. After a thorough review of the entire statute, and its few intersecting provisions with the Juvenile Act, there is simply no applicable mandate in the CPSL to which CYS failed to adhere at the most recent permanency hearing. Accordingly, this error should not be considered on appeal.

II. Whether [Mother] completed all services required by [CYS] and the Court failed to apply the law to the facts of the case and return [Children] to [Mother].

Mother contends that she has completed all services required by CYS in the FSP and therefore should have Children returned to her.

As noted above, a trial court's determination on a permanency order will only be disturbed or modified if there has been an abuse of discretion. In the Interest of A.L.D., 797 A.2d 326, 336 (Pa. Super. 2002). As part of the exercise of discretion in making its decisions on a dependency order, the trial court is to determine, *inter alia*, "the

continuing necessity for and appropriateness of the placement." 42 Pa. C.S. §6351(f)(1). One factor courts will examine is the parent's compliance with the services plan developed by the appropriate child services agency, which will often consist of various classes, physical and mental health evaluations, and other steps a parent must take to be reunified with their dependent child. Although evidence of a parent's compliance with these plans may be probative for determining the child's placement, ultimately "the focus of dependency proceedings is on the children's safety, permanency, and well-being, not on [the parent's] conduct." In re N.C., 909 A.2d 818, 823 (Pa. Super. 2006). Moreover, "matters of custody and placement must be decided under the *child's* best interests standard, not those of parents." Id. (emphasis in original).

As Mother's contention here involves the extent of her compliance with the FSP, the N.C. case proves illuminating. In N.C., a mother of five children, each of whom had been adjudicated dependent, appealed the trial court's decision to change the goal of her children's permanency plans from reunification to adoption. Id. at 822. One of mother's arguments was that the trial court abused its discretion in granting the goal change because she "had largely complied with the provisions of her permanency plan, had alleviated the circumstances that had led to the children's original placement, and had diligently worked for reunification with her children." Id. at 824. Upon review of the full case record, the Superior Court affirmed the trial court's determination, stating that "while [the mother] has made substantial progress toward achieving the goals of her permanency plan, her parenting skills, including her judgment with regard to the emotional well-being of her children, remain problematic." Id. at 825. See also In re S.B., 943 A.2d 973 (Pa. Super. 2008) (Superior Court affirmed trial court's decision to

53RD
JUDICIAL
DISTRICT

WRENCE COUNTY
PENNSYLVANIA

12

change permanency goal from reunification to adoption despite evidence of substantial compliance with permanency plans).

Lack of compliance with a permanency plan, such as failure by a parent to complete required counseling, has also been used by courts as a decisive factor in permanency and termination of parental rights cases. See, e.g., In re B.L.W., 843 A.2d 380 (Pa. Super. 2004) (Superior Court upheld trial court's decision that failure of a parent to complete counseling was sufficient evidence to support termination of her parental rights); In re A.L.D., 797 A.2d 326, 337 (Pa. Super. 2002) (acts of refusal to comply with a permanency plan are grounds for termination of parental rights, such as failure to complete required counseling). In short, a parent's compliance, or lack thereof, with a permanency plan is one factor to consider when making a permanency determination but is not dispositive.

Since the FSP was issued in 2014, it is beyond dispute that Mother has satisfactorily completed many of its requirements, including participating in counseling both individually and with her daughters, undergoing numerous mental health and psychological evaluations (including a positive assessment from Gallo & Associates in January 2016), keeping her home clean and free of clutter, and completing domestic violence counseling. See Petitioner's Exhibit 1, 9/18/18. Indeed, even the CYS caseworker who developed the FSP noted that Mother had made significant progress towards completion. N.T., 8/28/18, at 31. However, Mother's contention in the Statement of Errors that she "completed all services as required" is patently untrue.

One outstanding task Mother has yet to accomplish for the FSP is obtaining an updated parental capacity assessment to follow up on an earlier one performed in 2014.

13

Another CYS caseworker commented on Mother's failure to follow through on this task at the most recent permanency hearing on September 17, 2018, pointing specifically to Mother's failure to complete the assessment through a CYS-approved provider. (Testimony of Amber Pieri, 9/17/18). Mother has offered to undergo the required parental capacity assessment through an independent psychological provider, but CYS has refused to accept any results therefrom. (Testimony of Mother, 9/17/18). While it may fall to a subsequent order of this Court to resolve these outstanding differences between Mother and CYS, the updated parental capacity assessment remained incomplete as of the most recent DRO. Without a new parental capacity for guidance, the results of the earlier assessment remain the most recent on record, which state that:

> Mother exhibits limits in her emotional, cognitive, and behavioral capacity...the relationship is currently impaired emotionally and placement back to the mother's home would likely lead to significant stress for the children and not be in their present best interest. [Mother] did not acknowledge the traumas the children have experienced. The lack of insight is an emotional safety concern for the children if they were to be placed with their mother at this time.

Petitioner's Exhibit 1, 9/17/18.

It was in consideration of this assessment and her failure to complete the requested update, as well as the earlier testimony of K.M.R., the CYS caseworkers, and Tanya Stahlman, when this Court stated on the most recent PRO "there has been no resolution of the issues relative to Mother's understanding of abuse in the child's life."

In summary, Mother has undoubtedly complied with a majority of the steps of the FSP, but she has failed to cooperate with CYS to meet one of the last remaining criteria, i.e. completion of an updated parental capacity assessment through a CYS selected provider. Furthermore, her failure to complete this assessment, coupled with additional

53RD
JUDICIAL
DISTRICT

WRENCE COUNTY
PENNSYLVANIA

14

testimonial evidence, casts doubt on Mother's ability to connect emotionally with Children and provide them with a safe and loving home. Accordingly, this Court was well within its discretion to decide that maintaining Children's current placement was both necessary and within their best interests despite Mother's general record of progress and compliance with respect to the FSP.

III. Whether [CYS] failed to provide any type of reunification counseling or generate a service plan to reunify [Children] with [Mother]. [CYS] withheld [Children] and appropriate reunification services after all other required services were completed by [Mother]. The Court failed to apply the law to the facts on this matter.

Mother contends that CYS failed to provide any type of reunification counseling or generate a service plan that would reunify Children with her, and that CYS withheld appropriate reunification services despite her completion of "all other required services."

Aside from the Juvenile Act, dependency and permanency matters in this Commonwealth are shaped in large part by the federal Adoption and Safe Families Act of 1997 (ASFA), a major purpose of which is keeping families involved in dependency proceedings unified as much as possible. 42 U.S.C. §§671-679. Our Supreme Court has provided a succinct background on the purpose of the ASFA and its relationship to family reunification:

> The federal government enacted ASFA and related statutes to address the problems of foster care drift and ensure that dependent children are provided permanent homes either through reunification or adoption. To accomplish this

goal, the federal government tied federal funding of foster care and adoption assistance to each state's adoption of a plan regarding its foster care system...[the] federal government required state plans to provide that "reasonable efforts shall be made to preserve and reunify families," absent certain exceptions. 42 U.S.C. §671(a).

In re D.C.D., 105 A.3d 662, 675-676 (Pa. 2014).

Further, it is well settled in Pennsylvania that any child services agency operating under the auspices of the Juvenile Act has an affirmative duty to "put forth a good faith effort in making services available to the parent," and this duty is "independent of the parent's duty to accept such efforts." C.K., *supra*, 165 A.3d at 943 (citing In re J.J., 515 A.2d 883, 890 (Pa. 1986)). There is a clear obligation on the part of a child services agency, when handling the cases of dependent children, that they make good faith efforts to provide reunification services so as to facilitate the most expedient and effective reunion between child and parent. Id. However, the duty only extends so far, as an agency "is not expected to do the impossible and is not a 'guarantor of the success of the efforts to help parents assume their parental duties.'" Id. at 942 (quoting In re A.L.D., 797 A.2d 326, 340 (Pa. Super. 2002)).

In essence, once a child has been adjudicated dependent, successfully achieving reunification is a two-way street requiring collaboration between the agency and parents. So long as the child services agency puts forth good faith and reasonable efforts at providing reunification services, the parent has a corresponding duty to comply and cooperate.

Mother's assertion that CYS failed to provide any type of reunification counseling or to generate a service plan for reunification is unsupported by the facts. It has been

the clear policy of this Court from the earliest days of the case that "return to parent or guardian" is Children's permanent placement goal. *See*, e.g., PROs dated 9/16/15, 3/11/16, 9/2/16, 3/22/17, 9/17/18. To effectuate this goal, CYS has facilitated group counseling for Mother and Children through outside providers, including Tressa French and Tanya Stahlman, since 2014. *See* Petitioner's Exhibit 1, 9/17/18; N.T. 3/16/17 at 64. Additionally, CYS implemented the FSP and its numerous provisions geared toward its explicit and primary goal of "reunification with parent" (e.g. having Mother make her home safe and suitable for children, completing mental health and psychological evaluations, and parental capacity assessments). For its part, CYS has complied with the good faith and reasonable efforts requirements, as demonstrated by years of repeated efforts to provide reunification counseling and encouraging Mother to take advantage of the services needed to complete remaining portions of the FSP.

Given that CYS has done its part to promote reunification, an examination of Mother's past actions once again reveals a mixed record. Setting aside her general record of compliance with the FSP but also her failure to complete the second parental capacity assessment, there simply has not been sufficient progress in rehabilitating the relationship between Mother and Children through reunification counseling. N.T. 3/16/17 at 49, 73-74. Nonetheless, it appears that Mother herself has been a beneficiary of these counseling services. As Ms. Stahlman explained at one permanency hearing in honest but optimistic terms:

> [Mother] is very motivated and committed to trying to understand [Children's] experience and to acquire the necessary skills that it would take to form an attachment with both of her daughters, yet there's some areas that we're still reviewing in therapy and working on... [such that] she can feel comfortable to

53RD
JUDICIAL
DISTRICT

WRENCE COUNTY
PENNSYLVANIA

17

validate, to understand, to communicate in a way with [K.M.R.] that is sensitive and understanding and caring.

Id. at 73.

This Court remains hopeful that Mother will develop the emotional tools to effectively bond with her daughters, and that Children will likewise arrive at a mutually loving and beneficial relationship with her. However, for purposes of this statement of error, the clear evidence that Children and Mother together attended these therapy sessions, and Mother's notable progress with Ms. Stahlman, more than refutes her argument that CYS failed to provide any type of reunification counseling. Plainly, CYS met its duty to promulgate a FSP with reunification as the goal and to provide reunification services. Consequently, it has been Mother's obligation to cooperate and comply, which is still a work in progress. Accordingly, this Court was under no obligation to direct CYS to return Children to Mother, and this error should not be considered on appeal.

IV.	Whether [CYS] failed to provide visits between [Mother] and [Children], based solely on the alleged belief that one of the two children voiced her desire not to see [Mother]. [CYS] failed to provide competent evidence that there was any basis to deny [Mother] visitation. The Court failed to apply the law to the facts on this matter.

Mother contends that CYS failed to provide visits between her and Children once they were adjudicated dependent, and that visits were withheld without sufficient justification.

One of the primary purposes of the Juvenile Act is to maintain family unity whenever possible, an important component of which is visitation between dependent children and their parents. In re C.J., 729 A.2d 89, 93 (Pa. Super. 1999) (internal citations omitted). However, the Juvenile Act does not provide any specific guidance to which courts are bound in evaluating the appropriate frequency of those visits. Id. (citing In the Interest of M.B., 674 A.2d 702, 706 n.3 (Pa. Super. 1996)). Although not binding on the courts, all child service agencies in the Commonwealth (including CYS) are bound by the following administrative regulation found at 55 Pa. Code §3130.68:

> Visiting and communication policies:
> (a) The county agency shall provide opportunity for visits between the child and parents as frequently as possible but no less frequently than once every 2 weeks at a time and place convenient to the parties and in a location that will permit natural interaction, unless visiting is:
> > (1) Clearly not in keeping with the placement goal – for example, in adoption or independent living.
> > (2) Freely refused in writing by the parents.
> > (3) Not in the child's best interest and is limited or prohibited by court order.

Other appellate decisions have reinforced the idea that the frequency of visitation between dependent children and their parents should be judged according to the best interests standard. Albright v. Commonwealth ex rel. Fetters, 421 A.2d 157, 158 (Pa. 1980); Niadna v. Niadna, 494 A.2d 856, 858 (Pa. Super. 1985).

However, our inquiry does not end here. Besides the best interests standard, parental visitation is measured against the grave threat standard. Generally, parents have a constitutionally protected liberty interest in visitation with their children, which must not be denied or limited unless visitation with the parent poses a grave threat to the

19

child. Santosky v. Kramer, 455 U.S. 745 (1982); Green v. Sneeringer, 635 A.2d 1074, 1075 (Pa. Super. 1993). Significant case law also exists in our Commonwealth supporting the grave threat standard. See M.B., supra, at 706 (Cavanaugh, J., dissenting). Which of these two standards applies will ultimately depend on the goal of the family service plan. Our Superior Court has clarified the distinction as "[when] reunification remains the goal of the family service plan, visitation will not be denied or reduced unless it poses a grave threat... [if], however, the goal is no longer reunification of the family, then visitation may be limited or denied if it is in the best interests of the child or children." C.J., supra, at 95 (internal citations omitted).

In some rare instances, however, our appellate courts have upheld trial court decisions to limit or suspend parental visitation even though the family service plan's goal remained reunification and a parent's deficiencies did not constitute a grave threat to the child's welfare. See In re Damon B., 460 A.2d 1196 (Pa. Super. 1983). The Damon B. case proves especially illustrative to the instant appeal. In Damon B., the eponymous child was adjudicated dependent less than a year after his birth, and was quickly placed with a foster family; additionally, six other siblings had been found dependent due to unsanitary conditions in the home. Id. at 1197. For three years, visitation between the child and his mother took place twice a month and the family service plan goal was reunification. Id. Three years after first taking the child into their care, the foster parents filed a notice of intention to adopt with the trial court, which then held a hearing on the matter. Id. Despite taking evidence of the natural mother's improved abilities in housekeeping and parenting, the trial court decided to reduce visitation from biweekly to quarterly because of the child's strong psychological bond

53RD
JUDICIAL
DISTRICT

LWRENCE COUNTY
PENNSYLVANIA

20

with his new family, such that returning to his birth family would result in serious emotional harm. Id. After the mother appealed, the Superior Court affirmed the trial court's decision on the basis that the visits were counterproductive and resulted in dire emotional stress. Id. at 1198. In other words, the Superior Court "thus implied that a grave threat existed, albeit not attributable to any present deficiency of the mother." C.J., 729 A.2d at 96 (discussing Damon B.).

A brief synopsis of Mother's visitation in this case is helpful. Initially following Children's removal from Mother's home in November 2013, CYS provided regular visitation, pursuant to 55 Pa. Code §3130.68, until August 2014. See Mother's Motion to Resume Visitation and for Counseling, November 21, 2014. At this time, CYS stopped facilitating regular visitation "due to the reluctance of [Children]." Id. Following the permanency hearing on January 6, 2015, this Court issued an order that appointed a counselor "for the purpose of determining the feasibility and timing of resumption of visits and efforts for reunification of the children and Mother..." Order of Court, January 6, 2015. This Court left it largely to the discretion of the counselor in determining if, when, and how visitation would resume. Id. Evidently, the counselor did not recommend resumption of visitation, as the next PRO specifically provided that "Prohibition of contact with [Children] shall continue unless approved by [CYS] and by further order." PRO, 9/15/15. Subsequent PROs have kept the same rule in place, including the subject of the instant appeal. See PRO, 9/17/18. Indeed, no order to date has lifted the earlier order of January 6, 2015.

Given that the goal of the permanency plan remains reunification, this Court's limitations on Mother's visitation shall be evaluated using the "grave threat" standard.[4] At first glance, when considering Mother's substantial compliance with the FSP, it appears that she possess no present mental or moral deficiencies that would pose a grave threat to Children and hence limit her visitation. However, similar to Damon B., it was and remains appropriate for this Court to limit visitation because interactions with Mother result in dire emotional stress for Children, to the point that the only way K.M.R. envisions feeling any permanent relief is by cessation of all contact with her. N.T., 3/16/17, at 17-19, 29, 38; see also, Petitioner's Exhibit 1, 9/17/18 (Mother's lack of insight and acknowledgement of Children's trauma "is an emotional safety concern...at this time."). Of additional import, as in Damon B., is that Children have formed strong familial bonds with their foster family. N.T., 3/16/17, at 46.

In short, while Mother may have improved her parenting skills since 2013, and while the threat of physical harm at her residence may have abated, Children still face a grave threat due Mother's continued inability to be emotionally supportive, both in general and in relation to the traumatic events of their childhood. Accordingly, neither CYS nor this Court improperly limited visitation, and this error should not be considered on appeal.

---

[4] CYS filed a Motion for Goal Change on April 11, 2017, asking this Court to modify the permanency goal from reunification to adoption, and all parties have vigorously argued this motion. Alongside CYS' concurrent filing of a Petition to Involuntarily Terminate Parental Rights, the goal change motion remains pending before this Court and until a final decision is rendered, the permanency goal officially remains reunification.

V.    Whether the Court failed to take testimony from both children regarding their individual desire to reunify with [Mother] thereby requiring the Court to make a decision as to both children based upon the unsubstantiated testimony of one child, while the other was withheld from the Court without justification.

Mother contends that this Court erred by failing to take testimony from both Children regarding their placement.

By statute, a court is permitted to receive reports and other evidence that will bear on the disposition of dependent children. 42 Pa. C.S. §6341(e). It is the responsibility of the trial court during permanency hearings to determine any questions on the credibility or admissibility of any evidence; "it is well settled that admission or exclusion of evidence is within the sound discretion of the trial court." In re A.H., 763 A.2d 873, 880 (Pa. Super. 2000). In general, the evidence that may be presented at a dependency hearing can be quite broad, as "the Juvenile Act provides liberal access to court records and provides the opportunity for liberal discovery in a dependency or delinquency action." Id. at 879 (quoting In re J.C., 603 A.2d 627, 630 (Pa. Super. 1992)).

Clearly, these underlying rules include witnesses appearing before the court and delivering oral testimony, which would then be admitted or excluded according to the trial court's discretion and in accordance with the law of evidence. Just as important as what to do when and after a witness testifies is determining when a witness is *required* to testify, or even be present, at a permanency hearing.

Our first source for answers on these questions is the plain text of the Juvenile Act itself. Once a dependency petition is filed, the court "shall direct the issuance of a

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

summons to the parents, guardian, or other custodian, a guardian ad litem, and any other persons as appear to the court to be proper or necessary parties...The summons shall also be directed to the child *if he is 14 or more years of age or is alleged to be a delinquent.*" 42 Pa. C.S. §6335(a) (emphasis added). In other words, unless the child who is the subject of the dependency petition is also alleged to be delinquent, the court is only required to issue a summons for his/her appearance at the initial dependency hearing if the child is 14 or older. For the subsequent permanency hearings, the Juvenile Act authorizes the court to "[upon] application of [any party to the proceedings], the court, master, or the clerk of court shall issue, or the court or master may on its own motion issue, subpoenas requiring the attendance and testimony of witnesses..." 42 Pa. C.S. §6333(a). In short, this means that any of the parties to a dependency case, or the court itself, can request and/or issue subpoenas compelling testimony for a particular proceeding.

Distinct from but nonetheless related to these provisions regarding mandated attendance by children at permanency hearings is the statute's requirement that the court consult with children in certain situations. 42 Pa. C.S. §6351(e)(1) states that:

> In any permanency hearing held with respect to the child, the court shall consult with the child regarding the child's permanency plan, including the child's desired permanency goal, in a manner appropriate to the child's age and maturity. If the court does not consult personally with the child, the court shall ensure that the views of the child regarding the permanency plan have been ascertained to the fullest extent possible and communicated to the court by the guardian ad litem...

53RD
JUDICIAL
DISTRICT

\WRENCE COUNTY
PENNSYLVANIA

Thus, it is clear that while the statute requires that the child's own wishes be taken into consideration when formulating a permanency plan, it also leaves courts with some discretion in obtaining that consultation. Likewise, another subsection of the same statute states that the court consult with the affected child as to his/her desired permanency goal in the event that the court orders the child placed into another planned permanent living arrangement. 42 Pa. C.S. §6351(f.1)(5)(iv)(A). Once more, however, the statute leaves the means of how the court accomplishes this consultation somewhat open ended. In short, although the courts must consult in some manner with a child as to his/her placement, whether directly or through a guardian ad litem, there is no commanding language that such a colloquy must take place during a permanency hearing or through a child's testimony.

In the instant appeal, it is clear that Children were at no point required to be at any of the permanency hearings. From the record, it is equally apparent that at no time did Mother avail herself of her statutory rights to compel them to attend and/or testify. First, the initial dependency petition was filed on November 4, 2013, shortly before K.M.R. turned 12 and J.L.A. turned seven. Because of their ages at the time, and because neither one faced allegations of delinquency, Children did not receive summonses to attend the initial dependency hearing. 42 Pa. C.S. §6335(a). Likewise, there is nothing in the record demonstrating that Mother, either *pro se* or through counsel, requested that this Court issue subpoenas pursuant to 42 Pa. C.S. §6333(a) demanding that Children be present and testify at any of the permanency review hearings despite her right to do so.

Of course, Children have been present at some of the hearings since 2013; for example, K.M.R. gave lengthy *in camera* testimony as part of the permanency review hearing on March 16, 2017. At the most recent permanency hearing on September 17, 2018, Mother's counsel noted on the record that neither Children were present. Their absence, however, is not the result of any error by this Court. Rather, the onus was on Mother to request this Court to issue subpoenas compelling Children to be present and available for examination by counsel. Indeed, since March 2017, there have been three permanency review hearings, at any one of which Mother could have exercised her right to call Children and J.L.A. in particular (who has not yet testified on the record) to attend and testify. Moreover, besides the weight accorded to K.M.R.'s substantial testimony in March 2017, this Court has complied with the statutory child consultation requirements via Children's Guardian Ad Litem, who has appeared at every permanency review hearing on their behalf and conveyed their wishes on permanency goals.

In short, Mother's claim that one child was "withheld from the Court without justification" is baseless. The more appropriate inquiry is what justification Mother had for not requesting a subpoena to compel one or both Children to testify at any of the numerous hearings held since March 2017. On the contrary, and acting within its discretion, this Court has respected and followed all laws regarding evidence, witnesses, and the presence of interested parties at all permanency hearings. Accordingly, this error should not be considered on appeal.

For the foregoing reasons, we respectfully request that the Superior Court affirm our PRO of September 17, 2018, and dismiss the appeal in this matter.

IN THE INTEREST OF:

K.M.R.

J.L.A.

: IN THE COURT OF COMMON PLEAS

: LAWRENCE COUNTY, PENNSYLVANIA

: NO. 94 OF 2013, DP

: NO. 95 OF 2013, DP

## Order of Court

AND NOW, this _5th_ day of November, 2018, the Court having received Mother's Concise Statement of Matters Complained of on Appeal pursuant to Pa. R.A.P. 1925(b) with Dennis W. McCurdy, Esq., representing Mother, the Court hereby ORDERS and DECREES as follows:

1. The Court issues the attached Opinion pursuant to Pa. R.A.P. 1925(a).

2. The Prothonotary shall properly serve notice of this Order and attached Opinion upon all counsel of record as contained in the Court's file, or to a party directly if unrepresented by counsel.

3. The Prothonotary shall immediately assemble the record for the above captioned cases and transmit said records, and this Opinion and Order therewith, to the Superior Court of Pennsylvania as required by all applicable Rules of Appellate Procedure.

FOR THE COURT:

_____, J.
John W. Hodge, Judge

53RD
JUDICIAL
DISTRICT

.WRENCE COUNTY
PENNSYLVANIA

FILED/ORIGINAL

2018 NOV -5 AM 11: 24

JODI KLABON-ESOLDO
PRO AND CLERK

FILED/ORIGINAL

2018 NOV -5 PM 1: 30

JODI KLABON-ESOLDO
PRO AND CLERK