J-S43017-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: K.G., MOTHER | : | No. 1010 MDA 2023 |

Appeal from the Order Entered June 30, 2023
In the Court of Common Pleas of Northumberland County
Juvenile Division at No(s):  CP-49-DP-42-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: A.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: K.G., MOTHER | : | No. 1011 MDA 2023 |

Appeal from the Order Entered June 30, 2023
In the Court of Common Pleas of Northumberland County
Juvenile Division at No(s):  CP-49-DP-00043-2021

BEFORE:   McLAUGHLIN, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY KING, J.:                    **FILED: JANUARY 24, 2024**

Appellant, K.G. ("Mother"), appeals from the order entered in the Northumberland County Court of Common Pleas, which changed the permanency goals for C.G. and A.F. ("Children") from reunification to adoption

---

[*] Retired Senior Judge assigned to the Superior Court.

and suspended Mother's visitation with Children. We affirm.

The relevant facts and procedural history of this case are as follows. A.F. was born to Mother and C.F. ("Father") in February of 2019. The Northumberland County Children and Youth Services ("CYS") became involved with the parents on April 1, 2019, when it received a child protective services ("CPS") referral after A.F. was admitted to the hospital with a right femur fracture that was ruled non-accidental. Mother and Father were the sole caretakers of A.F. at the time that he was injured. A.F. was not removed from the parents' custody at this time. CYS received another CPS referral on July 14, 2019, alleging substance abuse by Mother and Father. Upon investigation, Father tested positive for THC and Mother tested positive for marijuana. A.F. continued to remain in the parents' custody following this incident.

C.G. was born to Mother and Father in May of 2020. On May 19, 2021, CYS received another CPS referral alleging a domestic disturbance at the residence where Mother was staying with Children. On the night in question, Mother returned from a bar to the residence and was very intoxicated. Mother engaged in a physical altercation with another adult member of the household. The adult member of the household informed CYS that she did not want Mother or Children to continue to stay in her residence. Father was incarcerated and was not substantially involved in Childrens' lives at this point. Children were removed from Mother's care and placed in temporary kinship placement with Mother's cousin and her paramour. CYS petitioned the court

to adjudicate Children dependent, alleging that Children were without proper parental care or control.

On August 5, 2021, the court adjudicated Children dependent and ordered that they remain in kinship placement with Mother's cousin and paramour. Mother was granted supervised visitation with Children. The court set the placement goal to reunification with natural parents. In furtherance of this goal, the court ordered Mother to obtain stable housing and employment, participate in family treatment court and remain drug free, undergo a behavioral health intake and follow the recommendations, and participate in parenting classes and demonstrate those learned skills during supervised visitation. On February 17, 2023, Children were removed from their kinship placement and placed with a foster family.[1]

The court conducted permanency review hearings on November 4, 2021, January 13, 2022, April 7, 2022, July 21, 2022, October 17, 2022, and January 12, 2023. At each of these hearings, the court found that there was minimal compliance with the permanency plan and Mother made minimal progress toward alleviating the circumstances which necessitated the original placement.

A bonding assessment was completed by Michael Gillum on April 8, 2022. Mr. Gillum reported the following observations and impressions:

From the time [Children] saw their mother and throughout

---

[1] The kinship home was no longer an option due to medical concerns.

the observation, they did not go to her…. In the actual observation, [Mother] was completely overwhelmed by [Children] and was unable to manage them. [Children] were engaging in reckless and dangerous behaviors such as climbing on chairs, and [Mother] did not notice or did not take action. She would focus on one child, allowing the other child to do as they pleased without supervision. [Children] often ran for the door, wanting to be released from the visitation room with [Mother]. At one point, C.G. actually opened the door and left the waiting room, running to his CYS caseworker. [Mother] was extremely loud in talking to [Children] and was also very immature. [Children] did not seem to be afraid of [Mother], however, did not appear to be seeking her out at all. When given a choice, [Children] went to everyone else except [Mother].

About half an hour into the observation, [Mother] was obviously losing patience with [Children] as they did not respect her and continued to do as they pleased.

\* \* \*

[Mother] appears to be an extremely poor parent and is certainly capable of injuring her children…. [Mother] said almost nothing about her children even when prompted to describe their personalities and activities. She made no mention of missing her children nor did she mention any affection or relationship details concerning her children…. She was clearly overwhelmed simply attempting to be with both [Children] simultaneously. [Mother] could not manage [Children] at all…. [Children] were very badly behaved when in the visitation room with [Mother]. [Mother] did not demonstrate any affection toward [Children]. The degree of bonding appears to be very minimal.

(Psychological Evaluation and Bonding Assessment, filed 7/13/22, at 4, 7).

Additionally, the solicitor's report filed on January 10, 2023 stated:

[Mother] has not shown a significant transfer of learning in visits as she remains unable to supervise more than one child at a time and has a habit of video calling her paramour during visits and failing to monitor the minor children at all until her attention is brought to the minor children getting

into something that they should not by the resource worker or justice works worker; all despite the repeated and explicit instructions of both the caseworker and resource worker.

(Solicitor's Report, filed 1/10/2023, at 3) (unpaginated).

On June 22, 2023, the court conducted another permanency review hearing. At this point, CYS sought to change the permanency goal from reunification to adoption and to terminate Mother's visitation with Children. Father was given notice of the hearing but did not appear.[2] Mother was present at the hearing and elected not to testify due to pending criminal charges against her.[3]

Timothy Sparta-Panarese, a CYS caseworker, testified that Children had been in the care of CYS for almost two years and Mother's progress in reaching the goals set forth to return Children to her care remained stagnant for most of that time. Mr. Sparta-Panarese stated that he was unsure about Mother's current employment status and Mother failed to present any evidence to demonstrate that she had stable employment. Mother also did not undergo a behavioral health intake to address any mental health concerns. Mother began treatment court in September of 2022 and participated in parenting

---

[2] Father's attorney, who was present, informed the court that Father received notice of the hearing while he was incarcerated but Father could not be located prior to the hearing after he was released from prison. Father is not party to this appeal.

[3] Mother has charges pending against her related to the injury sustained by A.F. while in Mother and Father's care.

classes. Nevertheless, Mother failed to transfer any learned skills during her supervised visits with Children. Mr. Sparta-Panarese testified that Mother was unable to care for both Children, failing to pay attention to safety hazards until it was brought to her attention by another individual. Mother did not demonstrate that she was able to care for Children for any period of time without supervision.

Mr. Sparta-Panarese acknowledged that Mother has consistently visited Children and participated in some of the goals set forth by CYS. Nevertheless, in the extended time that Children have been in the care of CYS, Mother made no meaningful progress in alleviating the issues that resulted in Children's placement. Mr. Sparta-Panarese opined that Mother's parenting is unlikely to progress in the near future such that Children are not in danger in her care, given that Mother has attended months of parenting classes and shown minimal improvement. He further testified that Children are happy and doing well in their foster home. They are well cared for and residing in a stable and safe environment.

The guardian *ad litem* ("GAL") informed the court that she was in favor of CYS's recommendations, noting there were legitimate concerns about Mother's ability to keep Children safe in her care. The GAL further opined that continued visitation would not be in Children's best interests as Mother has demonstrated minimal progress in her ability to parent them, and continued contact would hinder Children's ability to move forward and have permanency

in their lives.

On June 30, 2023, the court entered an order changing the permanent placement goal to adoption and suspended all further visitation between Mother and Children. On July 13, 2023, Mother timely filed separate notices of appeal from the orders concerning each child, and concise statements of errors complained of on appeal. This Court consolidated Mother's appeals *sua sponte* on August 4, 2023.

Mother raises the following issues for our review:

> Did the trial court abuse its discretion in granting [CYS]'s request for a goal change from reunification to adoption?

> Did the trial court abuse its discretion in terminating all visitation of Mother?

(Mother's Brief at 6).

In her issues combined, Mother contends that the court failed to consider all factors listed in 42 Pa.C.S.A. § 6351(f), relevant to the court's approval of a goal change. Mother asserts that she has substantially complied with all of CYS's directives, including participating in treatment court, maintaining her sobriety, and participating in parenting classes. Mother maintains that CYS failed to demonstrate that Children were not safe in Mother's care because the only example provided by Mr. Sparta-Panarese to support his opinion was one instance where Mother did not notice that Children were running away at the park. Mother claims CYS and the court are essentially punishing her for the pending criminal charges against her related

to A.F.'s past injuries. Mother insists that the ongoing criminal matter is an inappropriate basis to support a goal change and the court erred in considering the criminal matter.

Additionally, Mother asserts that the court failed to address the suspension of Mother's visitation in any meaningful way. Mother contends that CYS failed to present any evidence that continued visitation would pose a grave threat to Children. Mother concludes that the court abused its discretion in approving the goal change to adoption and suspending all of Mother's visitation rights, and this Court should grant relief. We disagree.

On appeal, goal change decisions are subject to an abuse of discretion standard of review. *In re N.C.*, 909 A.2d 818, 822 (Pa.Super. 2006).

> In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was "manifestly unreasonable," that the court did not apply the law, or that the court's action was "a result of partiality, prejudice, bias or ill will," as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witness and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm, "even if the record could also support an opposite result."

*Id.* at 822–23 (internal citations omitted).

The Juvenile Act controls the disposition of dependent children. *In re R.P.*, 957 A.2d 1205, 1217 (Pa.Super. 2008). Section 6351 provides in relevant part:

- 8 -

## § 6351.  Disposition of dependent child

\*    \*    \*

**(f)  Matters to be determined at permanency hearing.**—At each permanency hearing, a court shall determine all of the following:

(1)    The continuing necessity for and appropriateness of the placement.

(2)    The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3)    The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4)    The appropriateness and feasibility of the current placement goal for the child.

(5)    The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6)    Whether the child is safe.

\*    \*    \*

(9)    If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

(10) If a sibling of a child has been removed from his home and is in a different placement setting than the child, whether reasonable efforts have been made to place the child and the sibling of the child together or whether such joint placement is contrary to the safety or well-being of the child or sibling.

(11) If the child has a sibling, whether visitation of the child with that sibling is occurring no less than twice a month, unless a finding is made that visitation is contrary to the safety or well-being of the child or sibling.

(12) If the child has been placed with a caregiver, whether the child is being provided with regular, ongoing opportunities to participate in age-appropriate or developmentally appropriate activities. In order to make the determination under this paragraph, the county agency shall document the steps it has taken to ensure that:

(i) the caregiver is following the reasonable and prudent parent standard; and

(ii) the child has regular, ongoing opportunities to engage in age-appropriate or developmentally appropriate activities. The county agency shall consult with the child regarding opportunities to engage in such activities.

**(f.1) Additional determination.**—Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1) If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(3) If and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(4) If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

\* \* \*

**(f.2) Evidence**.—Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including evidence of the use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk, shall be presented to the court by the county agency or any other party at any disposition or permanency hearing whether or not the conduct was the basis for the determination of dependency.

**(g)** **Court order**.—On the basis of the determination

made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f), (f.1), (f.2), (g).

"When the child welfare agency has made reasonable efforts to return a [dependent] child to his or her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home." *In re N.C., supra* at 823.

> Although the agency has the burden to show a goal change would serve the child's best interests, "[s]afety, permanency, and well-being of the child must take precedence over **all** other considerations" under Section 6351. *In re D.P.*, 972 A.2d 1221, 1227 (Pa.Super. 2009), *appeal denied*, 601 Pa. 702, 973 A.2d 1007 (2009) (emphasis in original); *In re S.B.*, … 943 A.2d 973, 978 [(Pa.Super. 2008)], *appeal denied*, 598 Pa. 782, 959 A.2d 320 (2008). "[T]he parent's rights are secondary" in a goal change proceeding. *In re D.P., supra*.
>
> Because the focus is on the child's best interests, a goal change to adoption might be appropriate, even when a parent substantially complies with a reunification plan. *In re N.C., supra* at 826-27. Where a parent's "skills, including her judgment with regard to the emotional well-being of her children, remain problematic[,]" a goal change to adoption might be appropriate, regardless of the parent's compliance with a permanency plan. *Id.* at 825. The agency is not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided. *In re A.L.D.*, 797 A.2d 326, 340 (Pa.Super. 2002). *See also In re S.B., supra* at 981 (giving priority to child's safety and stability, despite parent's substantial compliance with permanency plan); *In re A.P.*, 728 A.2d 375, 379 (Pa.Super. 1999), *appeal denied*, 560 Pa. 693, 743 A.2d 912 (1999) (holding where, despite willingness, parent cannot meet "irreducible minimum parental responsibilities, the

> needs of the child must prevail over the rights of the parent"). Thus, even where the parent makes earnest efforts, the "court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006).

*In re R.M.G.*, 997 A.2d 339, 347 (Pa.Super. 2010).

Additionally, the standard by which the court must determine whether to grant visitation to a parent is dependent upon the placement goal mandated in the family service plan. *See In re C.B.*, 861 A.2d 287, 293 (Pa.Super.2004), *appeal denied*, 582 Pa. 692, 871 A.2d 187 (2005). "Where reunification still remains the goal of the family service plan, visitation will not be denied or reduced unless it poses a grave threat." *Id.* (internal citation omitted). "If the goal is no longer reunification of the family, then visitation may be limited or denied if it is in the best interests of the child or children." *Id.* "The 'best interests' standard, in this context, is less protective of parents' visitation rights than the 'grave threat' standard." *In re B.G.*, 774 A.2d 757, 760 (Pa.Super. 2001) (citation omitted).

> To determine whether visitation is in the child's best interest the court may consider all evidence relating to the child's best interest including but not limited to the following factors: (1) length of separation from natural parents; (2) effect of visitation on the child; (3) the age, sex and health of the child; (4) the emotional relationship between child and parents; (5) the special needs of the child; and (6) the effect on the child's relationship with the current caregiver, usually the foster parents. Most importantly, the focus must be on the best interests of the child, in light of the fact that the natural family is not likely to be reunited.

*In Int. of M.B.*, 674 A.2d 702, 706 (Pa.Super. 1996).

- 13 -

Instantly, the court determined that a goal change to adoption was in Children's best interests. Contrary to Mother's assertion, the court specifically evaluated each factor listed in Section 6351(f) in its June 30, 2023, permanency review order. (*See* Permanency Review Order, filed 6/30/23, at 1-2). Significant to its goal change determination, the court explained:

> At the time of the hearing twenty-two months had elapsed since placement of the child. While Mother has participated in parenting classes and visitation the uncontroverted testimony is that she fails to apply skills from the parenting class and the children remain at risk even during a two-hour supervised visitation. Mother presented no evidence that she was employed or had suitable housing for her children. There is also the issue of the pending criminal charges against her stemming from the abuse that was part of the need for placement. While Mother is presumed innocent the [c]ourt remains mindful that if convicted, she could face imprisonment and further separation from the children.

(Trial Court Opinion, filed 8/31/23, at 3) (unpaginated).

The record supports the court's determination. Mr. Sparta-Panarese testified that although Mother participated in parenting classes, Mother has not demonstrated any learned skills in her interactions with Children and has made minimal progress in doing so during the time that Children have been in placement. He further stated that safety concerns persist while Children are in Mother's care during the supervised visits such that Children should not be in Mother's unsupervised care. While Mother is correct that Mr. Sparta-Panarese only testified to one specific example of Mother's inattentiveness during visitation at the June 22, 2023 permanency review hearing, the record is replete with other examples of Mother's inability to parent Children during

her supervised visits. Multiple solicitor's reports have noted that Mother is unable to supervise both Children at the same time, is prone to being distracted by her phone, fails to monitor Children until prompted by another adult, and is largely unable to manage or control Children. Similarly, the bonding assessment report notes that Children were engaging in reckless and dangerous behavior and Mother failed to notice or take action to keep Children safe. The record supports Mr. Sparta-Panarese's testimony and the court further found it to be credible. **See In re N.C., supra**. Accordingly, the court did not err in finding that Mother had made insufficient progress towards alleviating the issues that necessitated Children's placement and a goal change to adoption was in Children's best interests. **See In re R.M.G., supra**.

Additionally, the record belies Mother's allegation that her pending criminal charges were the "true" basis for the goal change. The record shows that Children were not removed from Mother's care following the incident underlying the pending criminal charges. Rather, Children were removed from Mother's care after an unrelated domestic disturbance when Mother and Children were asked to leave the home in which they were residing. Following this incident, CYS determined that Mother was unable to adequately care for Children and placed them in kinship care. CYS did not at any point raise Mother's criminal charges a basis to support the goal change, and there was no evidence presented at the permanency hearing pertaining to the criminal charges or the underlying factual basis concerning those charges. The only

mention of the criminal charges was from Mother's counsel, who argued that Mother was making progress towards her goals despite the stress and pressure of the pending criminal charges. Although the court mentioned in its opinion that Mother has pending charges against her, the court specifically noted that Mother is presumed innocent, and the court did not base its goal change decision on these pending charges. Thus, there is no merit to Mother's claim that the court impermissibly considered her pending criminal charges.

Further, the bonding assessment concluded that there was a minimal bond between Mother and Children, noting that Children consistently went to others over Mother during their visitation and Mother did not display significant affection toward Children. Mr. Sparta-Panarese also testified that Children were doing well in the care of their foster family. The GAL further opined that suspending visitation would be in Children's best interests so that they could move forward with their lives and work towards permanency and consistency with their foster family. The record provides ample support for the court's determination that suspending Mother's visitation with Children was in Children's best interests. *See In re C.B., supra*; *In Int. of M.B., supra*. Consistent with the goal change to adoption, the court was no longer limited by the "grave threat" standard concerning restriction of visitation. *See In re C.B., supra*. On this record, we see no abuse of discretion concerning the court's order. *See In re N.C., supra*. Accordingly, we affirm.

Order affirmed.


Judgment Entered.


_____

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>1/24/2024</u>